ASOCIACIÓN DE ACADEMIAS Y COLEGIOS CRISTIANOS DE PUERTO RICO ET AL., peticionarios y apelantes, *v.* ESTADO LIBRE ASOCIADO DE PUERTO RICO, DEPARTAMENTO DE EDUCACIÓN ET AL., apelados.

*Números:* AC-92-434 *Resueltos:* 22 de febrero de 1994
AC-91-478

*Julio Nigaglioni Arrache, Rubén T. Nigaglioni* y *Emilio Pena Fonseca,* de *Ledesma, Palou & Miranda,* abogados de la apelante Universidad de Puerto Rico; *Eric E. Vivoni Farage,* abogado de la apelada; *Anabelle Rodríguez, Reina Colón de Rodríguez* y *Carlos Lugo Fiol, Procuradores Generales Interinos,* y *María Adaljisa Dávila, Procuradora General Auxiliar,* abogados de El Pueblo.

EL JUEZ ASOCIADO SEÑOR FUSTER BERLINGERI emitió la opinión del Tribunal.

Tenemos ante nuestra consideración dos (2) recursos sobre cuestiones constitucionales, estrechamente relacionadas entre sí, que han sido consolidados. En el primer caso nos toca resolver, en esencia, si la reglamentación impuesta por el Estado a las escuelas privadas religiosas viola la garantía constitucional sobre el libre ejercicio de la religión. En el segundo caso debemos resolver si el requisito de admisión de la Universidad de Puerto Rico, de que todo solicitante se haya graduado de una escuela autorizada por el Departamento de Educación para operar en el país, viola la cláusula de la igual protección de las leyes.

I

Entre el 30 de abril y el 1ro de mayo de 1991 la Universidad de Puerto Rico (en adelante U.P.R.) le informó a siete (7) estudiantes que sus solicitudes de admisión no podían ser tramitadas debido a que éstos no eran egresados de escuelas certificadas por el Departamento de Educación (antes Departamento de Instrucción Pública) conforme a la Ley Núm. 31 de 10 de mayo de 1976, según enmendada por la Ley Núm. 49 de 30 de junio de 1988 (18 L.P.R.A. ants. secs. 2101–2106) y la Ley Núm. 68 de 28 de agosto de 1990

(3 L.P.R.A. sec. 391 *et seq.*). Dicha ley requiere que toda institución educativa a nivel preescolar, elemental y secundario obtenga una licencia del Departamento de Educación para poder operar en Puerto Rico. La U.P.R. les informó a los estudiantes que sus solicitudes serían mantenidas en moratoria hasta que las escuelas de donde provenían gestionaran su licencia con la agencia pública.

El 17 de mayo de 1991 la Asociación de Academias y Colegios Cristianos (en adelante Asociación), un grupo de escuelas adscritas a dicha organización, varios pastores y los siete (7) estudiantes cuyas solicitudes fueron mantenidas en moratoria (representados por sus padres) iniciaron ante el Tribunal Superior una acción civil de sentencia declaratoria, entredicho provisional, interdicto preliminar e *injunction* permanente contra el Estado Libre Asociado (en adelante E.L.A.), el Departamento de Educación, su entonces Secretaria Celeste Benítez, el Departamento de Justicia, su entonces Secretario Héctor Rivera Cruz, la U.P.R. y su entonces Presidente, José M. Saldaña.

En síntesis, los estudiantes demandantes alegaron que el requisito de admisión a la U.P.R. era inconstitucional por violar la cláusula sobre la igual protección de las leyes y su derecho constitucional a recibir una educación. Por su parte, las escuelas demandantes alegaron que el requisito de obtención de licencias, exigido por la citada Ley Núm. 31, según enmendada, era inconstitucional porque infringía la doctrina de separación entre la Iglesia y el Estado.

El 12 de junio de 1991 el tribunal de instancia dictó una orden mediante la cual bifurcó las reclamaciones incluidas en la demanda. Dictaminó que atendería los reclamos de los estudiantes demandantes como un "injunction preliminar y permanente", mientras que las reclamaciones de la Asociación y de las escuelas se ventilarían mediante sentencia declaratoria.

Luego de varios incidentes procesales, el 25 de junio de 1991 el Tribunal Superior dictó una sentencia parcial en la

que declaró inconstitucional dicho requisito de admisión a la U.P.R. y ordenó a ésta que tramitara las solicitudes de admisión de los estudiantes.[1] El tribunal basó su decisión en dos (2) fundamentos. Primero, estimó que el requisito de admisión contravenía la cláusula constitucional sobre la igual protección de las leyes, ya que no se aplicaba a todos los estudiantes con igual rigurosidad. Según el tribunal, no se les requería a todos los aspirantes a admisión el haberse graduado de una escuela acreditada por el Departamento de Educación, ya que a los estudiantes provenientes de Estados Unidos u otros países sólo se les requería prueba de que su escuela de procedencia contaba "con la autorización o acreditación gubernamental", sin que la U.P.R. indagara sobre las exigencias impuestas por el Gobierno correspondiente a la institución educativa en cuestión. Este requisito tampoco se les exigía a los estudiantes que tomaban el examen de equivalencia administrado por el Departamento de Educación. El tribunal de instancia también concluyó que el referido requisito cerraba "las puertas de la Universidad a los autodidactas que soliciten admisión". Caso Núm. AC-91-478, Apelación, Anejo II, pág. 7.

En segundo lugar, el tribunal adujo que el requisito impugnado incidía sobre el derecho fundamental a la educación y, como tal, estaba sujeto a un estricto escrutinio judicial. El tribunal concluyó que la U.P.R. no había podido justificar tal requisito rigurosamente.

El 26 de julio de 1991 la U.P.R. compareció ante nos

---

[1] Inconforme con esta determinación del Tribunal Superior, el 16 de julio de 1991 el Estado Libre Asociado de Puerto Rico, a través de la Oficina del Procurador General, presentó un escrito de apelación ante el Tribunal Supremo, acompañado por una moción en auxilio de jurisdicción.

El 19 de julio de 1991 emitimos una resolución para desestimar el recurso presentado por el Estado. Posteriormente el Estado, como parte de su moción de reconsideración, solicitó que se le permitiera intervenir como *amicus curiae* en el recurso instado por la Universidad de Puerto Rico. Dicha participación fue aceptada mediante nuestra Resolución de 23 de agosto de 1991. El Estado Libre Asociado presentó su alegato el 14 de noviembre de 1991.

Asimismo, el 10 de agosto de 1992 el Instituto Rutherford, mediante moción, solicitó a este Tribunal permiso para intervenir como *amicus curiae*. Este Tribunal no tomó acción sobre dicha solicitud.

mediante un escrito de apelación y solicitó la revocación de la sentencia dictada el 25 de junio de 1991. Le imputó al foro de instancia haber errado al resolver que el requisito en controversia era inconstitucional.([2]) Mediante Resolución de 30 de julio de 1991, dimos curso a este recurso de apelación.([3])

Por otro lado, el 12 de junio de 1992 el tribunal de instancia desestimó la otra parte bifurcada del caso, la reclamación de la Asociación sobre sentencia declaratoria, por entender que era necesario que la Asociación agotara los

---

([2]) La U.P.R. específicamente señaló la comisión de los errores siguientes:

1. Incidió el tribunal al decretar que el requisito de admisión violenta la cláusula de la igual protección de las leyes y el derecho fundamental a la educación.

2. Incidió el tribunal al haber dictado el injunction sin haberse perfilado una violación constitucional.

([3]) El 2 de agosto de 1991 la parte demandante apelada, mediante una "Moción urgente en auxilio de jurisdicción y reconsideración", nos informó que la U.P.R. ya había admitido a todos los estudiantes demandantes, antes de la presentación de su recurso de apelación. Los estudiantes solicitaron que se les permitiera comenzar sus estudios en la U.P.R., ya que ellos habían hecho todos los arreglos necesarios —económicos y de otra índole— para estudiar allí.

Mediante Resolución de 2 de agosto de 1991, concedimos un término a la U.P.R. para que se expresara sobre estas últimas alegaciones y remedios solicitados por los estudiantes y para que explicara "las razones que tuvo para no informar en sus escritos anteriores los hechos alegados por los apelados en la mencionada moción relativos a la admisión de éstos a dicha Universidad". Caso Núm. AC-91-478, Resolución de 2 de agosto de 1991.

El 9 de agosto de 1991, luego de evaluadas las mociones de los demandantes en auxilio de jurisdicción a la luz del escrito presentado por la U.P.R., ordenamos mediante resolución la admisión provisional de los estudiantes a la U.P.R. Dicha acción del Tribunal tuvo el efecto de tornar académico el segundo señalamiento de error que la U.P.R. presentara en su apelación referente al interdicto solicitado por los estudiantes en contra de la U.P.R. para que se tramitasen sus solicitudes de admisión. En vista de que han transcurrido más de dos años y medio (2 1/2) desde que ordenamos la admisión temporal de estos estudiantes, resolvemos por razones de equidad, que éstos pueden completar los estudios universitarios iniciados.

Meses más tarde, la Asociación demandante presentó ante nos una moción en auxilio de jurisdicción en la que nos solicitó que le permitiéramos continuar con la acción de sentencia declaratoria (la otra parte bifurcada del caso) y que ordenáramos al Director de la Oficina de Asuntos Académicos de la U.P.R. tramitar las solicitudes de admisión de otros estudiantes provenientes de escuelas afiliadas a la Asociación.

Mediante Resolución de 7 de mayo de 1992 señalamos, en cuanto a la primera solicitud, que no había nada que proveer. Aclaramos que ninguna de nuestras órdenes o resoluciones tenía el efecto de paralizar la acción separada de sentencia declaratoria que el foro de instancia remitió al trámite ordinario.

En cuanto a la segunda solicitud, la declaramos no ha lugar sin perjuicio de que la estudiante en cuestión y cualesquiera otros en su misma posición solicitaran intervenir en el caso y fuesen evaluados sus casos individualmente.

remedios administrativos. Resolvió que correspondía al Director del Consejo General de Educación determinar si la aplicación de la Ley Núm. 68, *supra*, y su nuevo reglamento —vigente desde el mes de abril de 1992— en las circunstancias alegadas por las escuelas demandantes, conllevaría una intervención administrativa excesiva en sus asuntos religiosos, de tal forma que confligiría con los derechos constitucionales consagrados en el Art. II, Sec. 3 de la Constitución del Estado Libre Asociado de Puerto Rico, L.P.R.A., Tomo 1. Resolvió, además, que la Ley Núm. 68, *supra*, tiene un propósito totalmente secular y que no promueve o inhibe la religión.

Inconforme con dicha determinación, el 17 de junio de 1992 la Asociación presentó una moción de reconsideración y solicitud de determinaciones de hechos y conclusiones de derecho adicionales, en la que se señaló que los demandantes no habían pedido que se les eximiera del requisito impuesto por la Ley Núm. 31, *supra*, sino que se declarara inconstitucional la ley. El Tribunal Superior acogió dicha moción el 23 de junio de 1992, pero la declaró sin lugar el 29 de junio de 1992.

En cumplimiento de lo ordenado por el tribunal de instancia, y a fin de evitar que éste expidiera una orden para el cierre de las escuelas, la parte demandante acudió ante el Consejo General de Educación, el 29 de junio de 1992, para que éste resolviese los planteamientos sobre la Ley Núm. 68, *supra*, y su reglamento. Mediante carta con fecha de 10 de julio de 1992, el Consejo General de Educación informó a la parte demandante que, luego de haber revisado la ley y el reglamento en cuestión, concluyó que éstos no constituían una carga sustancial que afectara la práctica de la religión de las escuelas demandantes más allá de un efecto incidental a la reglamentación uniforme de actividades seculares.

El 28 de julio de 1992 la parte demandante apeló ante nos la sentencia del tribunal de instancia.

Mediante Resolución de 30 de julio de 1992, consolidamos el caso de la Asociación con el caso de la U.P.R. Además, acordamos considerar el escrito de apelación presentado por la Asociación como una petición de *certiorari* y expedir el recurso.

Luego de varios incidentes procesales, el 4 de septiembre de 1992, mediante resolución, ordenamos la paralización de los procedimientos ante el tribunal de instancia y los organismos administrativos en vista de que habíamos expedido un auto de *certiorari* el 30 de julio de 1992.

El 10 de diciembre de 1992, la Asociación sometió su alegato.

Posteriormente, el 14 de abril de 1993, la Oficina del Procurador General presentó ante nos su informe.

Luego de haber examinado los alegatos de las partes, pasamos a resolver.

## II

En el caso de la Asociación, los apelantes hicieron numerosos señalamientos de error. En esencia, éstos se reducen a impugnar la constitucionalidad de la Ley Núm. 31, *supra*, según enmendada, por entender que su aplicación les impide el libre ejercicio de su religión consagrado en el Art. II, Sec. 3 de la Constitución del E.L.A., *supra*.([4]) Veamos si tienen razón.

---

([4]) Aunque en sus alegatos la parte demandante da mayor énfasis a la Ley Núm. 31 de 10 de mayo de 1976, según enmendada, 18 L.P.R.A. sec. 2101 *et seq.*, es preciso señalar que son varias las leyes que, en conjunto, rigen la operación de las escuelas privadas de la Isla. Veamos.

La Ley Núm. 31, *supra*, estableció el requisito de obtener y mantener vigente una licencia para aquellas escuelas privadas que fueran a establecerse y operar en Puerto Rico. Dicha ley fue enmendada por la Ley Núm. 49 de 30 de junio de 1988.

La Ley Núm. 49, *supra*, establece las normas y requisitos que deben cumplir las escuelas privadas que operan o desean operar en Puerto Rico. Dicha ley facultaba al

El Art. II, Sec. 3 de nuestra Constitución, *supra*, ed. 1982, pág. 262, establece que:

No se aprobará ley alguna relativa al establecimiento de cualquier religión ni se prohibirá el libre ejercicio del culto religioso. Habrá completa separación de la iglesia y el estado.

■ Dicho artículo consagra la libertad de culto, prohíbe que el Estado establezca una religión oficial y ordena la total separación entre Iglesia y Estado. *Agostini Pascual v. Iglesia Católica*, 109 D.P.R. 172 (1979); *Academia San Jorge v. J.R.T.*, 110 D.P.R. 193 (1980); *Surinach v. Pesquera de Busquets*, 604 F.2d 73 (1er Cir. 1979); *Sucn. de Victoria v. Iglesia Pentecostal*, 102 D.P.R. 20 (1974). En el caso de autos, aunque la parte demandante alegó la violación del Art. II, Sec. 3 de nuestra Constitución, *supra*, en todas sus vertientes, realmente se trata de un caso en el que se alega que una actuación gubernamental viola el li-

---

Secretario de Instrucción Pública para promulgar las reglas y los reglamentos necesarios para el otorgamiento de licencias a las instituciones privadas desde los niveles preescolares a los post secundarios no universitarios.

Posteriormente, el 28 de agosto de 1990 se aprobó la Ley Núm. 68, Ley Orgánica del Departamento de Educación, 3 L.P.R.A. sec. 391 *et seq.* Dicha ley creó el Consejo General de Educación y le concedió autoridad para otorgar licencias y autorizar el establecimiento y operación en Puerto Rico de las escuelas públicas y privadas no universitarias, en conformidad con el Capítulo II de la Ley Núm. 31 de 10 de mayo de 1976, según enmendada por la Ley Núm. 49, *supra*, 18 L.P.R.A. secs. 2111–2125.

A fin de hacer viable el cumplimiento de sus funciones, y en armonía con las leyes aplicables vigentes, el Consejo General de Educación aprobó, en enero de 1992, el Reglamento para Otorgar Licencias a Instituciones Educativas Privadas e Instituciones Educativas Públicas de Nivel Preescolar, Elemental, Secundario, Especial, Vocacional, Técnico y de Altas Destrezas o Postsecundario no Universitario en Puerto Rico. Éste se puso en vigor el 30 de abril de 1992.

Dicho reglamento está dividido en cuatro (4) capítulos. El Capítulo 1 incluye unas disposiciones generales aplicables a las instituciones educativas privadas y públicas. En el Capítulo 2 se establecen unas disposiciones para otorgar y renovar licencias a las instituciones educativas privadas. Las disposiciones para otorgar y renovar licencias a las instituciones educativas públicas se establecen en el Capítulo 3. El Capítulo 4 recoge los aspectos de responsabilidad pública y unas disposiciones legales generales aplicables a todas las instituciones educativas.

bre ejercicio de la religión de los demandantes, tanto a nivel individual como colectivo.[5]

En *Díaz v. Colegio Nuestra Sra. del Pilar*, 123 D.P.R. 765 (1989), establecimos que la cláusula de libertad de culto garantiza la práctica de las creencias religiosas individuales o colectivas. Conforme la jurisprudencia federal, señalamos que aunque la libertad de credo es absoluta, la autonomía para *actuar* de acuerdo con dichas creencias tiene limitaciones.[6] Cuando el Estado promueve algún fin legítimo gubernamental, pero afecta adversamente la práctica de un culto religioso, la garantía constitucional requiere, en algunas situaciones, que se hagan concesiones para permitir el libre ejercicio de las creencias religiosas. Íd. Véase, además, 3 *Rotunda Nowak y Young, Treatise on Constitutional Law: Substance and Procedure* Sec. 21.6 (1986). Sin embargo, no todas las actuaciones gubernamentales que intervienen con la libertad de culto requieren un acomodamiento. *Díaz v. Colegio Nuestra Sra. del Pilar*, supra. Si el efecto adverso de la acción gubernamental sobre la práctica religiosa es *incidental* y el Estado tiene un interés legítimo y apremiante que justifique su acción, prevalece la acción gubernamental. Pero si la acción gubernamental es neutral y de aplicabilidad general, es decir, si se trata de una reglamentación de estricto contenido secular que recae uniformemente sobre todo un género de activi-

---

[5] Sostuvo la parte demandante que la filosofía educativa que impone el Estado es el humanismo secular y que éste es una religión contraria al cristianismo que ellos profesan.

Según los demandantes, la Ley Núm. 68, *supra*, expresa de modo directo que el Departamento de Educación responde a una filosofía de carácter humanista al establecer, en el Art. 1.02(4), lo siguiente:

"Partiendo de una *filosofía humanística* de la educación que se desprende de nuestra Constitución, mediante este estatuto se establece una determinada estructura administrativa para que, propiamente dicho, agilice la autonomía educativa de la escuela; para que acorte las distancias institucionales entre los maestros, los padres y los funcionarios administrativos; y para que garantice la participación de estos grupos en la toma de decisiones." (Énfasis en el original.) Caso Núm. AC-92-434, Apelación, pág. 13.

[6] Véase, a modo de ejemplo, *Cantwell v. Connecticut*, 310 U.S. 296, 303–304 (1940).

dades, entonces dicha reglamentación ni siquiera tiene que estar justificada por un interés apremiante del Estado si sólo tiene un efecto incidental sobre una práctica religiosa particular.(7)

En vista de lo anterior, cuando se cuestiona una actuación gubernamental bajo la cláusula de libertad de culto, la parte interesada viene obligada a establecer que el Estado no tiene el correspondiente interés público que justifique su actuación o que se le ha impuesto un gravamen o carga *sustancial* al ejercicio de su religión. Véase *Tony & Susan Alamo Foundation v. Secy. of Labor*, 471 U.S. 290, 303 (1985). Una carga mínima o incidental impuesta por el Estado a una parte de ordinario no es suficiente para invocar exitosamente la garantía sobre la libertad de culto. *Díaz v. Colegio Nuestra Sra. del Pilar*, supra, pág. 779; L.H. Tribe, *American Constitutional Law*, 2da ed., Nueva York, Ed. Foundation Press, 1988, Secs. 13–14. La parte que alegue que se le ha violado su libertad de culto tiene el peso de la prueba y debe demostrar concretamente cómo es que la reglamentación en cuestión viola sustancialmente el libre ejercicio de su religión.(8) Por ello, al ponderar el planteamiento ante nos, debemos dilucidar si los apelantes han establecido que los requisitos impuestos por el Estado a las escuelas privadas religiosas en cuestión interfieren sustancialmente con el libre ejercicio de la religión que profesan los apelantes, de tal manera que se requiera algún tipo de acomodamiento para proteger su libertad de culto, o si, por el contrario, sólo existe una interferencia incidental pro-

---

(7) El último caso resuelto por el Tribunal Supremo federal sobre la cláusula de libre ejercicio de culto, *Church of Lukumi v. Hialeah*, 124 L.Ed.2d 472, 508 U.S. 520 (1993), sostiene que "a law that is neutral and of general applicability need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice". Véase, además, *Employment Div., Dept. of Human Res. v. Smith*, 494 U.S. 872 (1990).

(8) Véanse: 2 *Valente, Education Law* Sec. 21.4, pág. 345 (1985); *State v. Andrews*, 65 Haw. 289, 651 P.2d 473 (Haw. 1982); *State v. Calvary Academy*, 217 Neb. 450, 348 N.W.2d 898 (1984); *Hill v. State*, 410 So. 2d 431 (1981).

ducto de un interés adecuado del Estado, en cuyo caso no es meritoria la reclamación de la parte afectada.

■ La Ley Núm. 49, *supra*, 18 L.P.R.A. sec. 2113, en esencia, dispone que las instituciones educativas, para obtener la licencia para operar, deben cumplir con los siguientes requisitos mínimos:

a. Tener permiso de uso para su planta física expedido por la agencia gubernamental correspondiente.

b. Evidenciar la preparación educativa y experiencia de la facultad de la institución, teniéndose en cuenta la naturaleza y los objetivos particulares de la institución.

c. Tener facilidades, equipo, servicios bibliotecarios y de laboratorio en aquella proporción que sea compatible con los objetivos y la naturaleza de la institución educativa solicitante.

d. Poseer un plan educativo o programación académica que incluya las formas y maneras en que dicho plan se instrumenta.

e. Tener los permisos correspondientes de las agencias gubernamentales relacionados con la protección de la salud y la seguridad de los estudiantes.

f. Haber realizado un estudio de viabilidad económica que demuestre que la institución puede razonablemente cumplir con los compromisos que habrá de contraer con respecto a todos los componentes de la institución o, en la alternativa, presentar ante el Secretario una fianza de cumplimiento con una vigencia no menor de un (1) año, expedida por una aseguradora autorizada a hacer negocios en Puerto Rico.

El reglamento que implanta los requisitos impuestos por la Ley Núm. 49, *supra*, señala los documentos que las escuelas privadas deben presentar para que se evalúen sus solicitudes.

Este reglamento también exige que las instituciones divulguen cierta información sobre las normas internas que rigen los *asuntos académicos* (requisitos de admisión, promoción, retención y graduación de estudiantes; calendario escolar y programa de trabajo propuestos), los *asuntos estudiantiles* (normas relacionadas con el costo de matrícula, cuotas, formas de pago, reglas de conducta en el plantel, sistema de evaluación, notas, transcripciones y certificacio-

nes, modelos de expedientes), los *asuntos de gobierno* (estructura de gobierno de la institución, documento que refleje su origen, una lista de nombres de los principales funcionarios) y de los *asuntos fiscales* (sistema de administración de fondos en lo que respecta a transacciones entre la institución y los estudiantes, capacidad de sostenimiento económico y número máximo de matrícula).

■ No se requiere un examen minucioso de la ley ni del reglamento en cuestión para concluir que los requisitos allí establecidos son válidos y no interfieren sustancialmente con la libertad de culto de los demandantes. Dichos requisitos son estrictamente seculares y constituyen una reglamentación mínima dirigida a garantizar que los servicios educativos que prestan las instituciones privadas en el país sean adecuados y se ofrezcan dentro de un ambiente escolar que facilite la enseñanza y el aprendizaje de los estudiantes. Concretamente, dichos requisitos sólo persiguen fines comunes de bienestar general; sólo regulan cuestiones fundamentalmente pertinentes de seguridad, salud, estructura física, preparación del personal docente y viabilidad económica de las escuelas privadas. Forman parte de una reglamentación uniforme creada por el Estado destinada a garantizar la calidad de la educación, actividad secular de gran interés para el Estado.

■ En el ámbito federal está claramente establecido que el Estado tiene un interés preeminente en la educación y se le ha reconocido amplia facultad y discreción para reglamentar las escuelas y asegurar la calidad de la educación provista a los ciudadanos. Así lo ha resuelto expresamente el Tribunal Supremo de Estados Unidos. Véanse, por ejemplo: *Meyer v. Nebraska*, 262 U.S. 390 (1923); *Vlandis v. Kline*, 412 U.S. 441 (1973); *Wisconsin v. Yoder*, 406 U.S. 205, 213 (1972); *Lemon v. Kurtzman*, 403 U.S. 602, 613 (1971); *Hamilton v. Regents*, 293 U.S. 245, 260–262 (1934); *Pierce v. Society of Sisters*, 268 U.S. 510, 534 (1925); *Marjorie Webster Jr. College v. Middle States Association of*

*Colleges and Secondary Schools, Inc.,* 139 U.S. App. D.C. 217, 221 esc. 19, 432 F.2d 650, 654 esc. 19, *cert.* denegado, 400 U.S. 965 (1970); *Farrington v. Tokushige,* 273 U.S. 284 (1927); *Everson v. Board of Education,* 330 U.S. 1 (1947); *Board of Education v. Allen,* 392 U.S. 236 (1968). Véase, además, 2 *Valente, Education Law* Sec. 21.4, págs. 345 y 346 (1985), y casos allí citados. Cabe señalar, que en la mayoría de aquellos casos en que se han invalidado requisitos estatales, los tribunales han basado sus determinaciones no en la falta de un interés apremiante por parte del Estado, sino en la amplitud, la vaguedad o el carácter *ultra vires* del estatuto.

▄▄▄ Nosotros también hemos reconocido en nuestra jurisdicción la gran importancia que tiene la educación para el Estado y lo apremiante que es el interés público en que las instituciones educativas del país, tanto públicas como privadas, ofrezcan servicios de calidad. Expresamente hemos resuelto que a través de la educación se imparte la preparación necesaria para que los ciudadanos participen en el desarrollo social y económico de nuestra vida colectiva. *De Paz Lisk v. Aponte Roque,* 124 D.P.R. 472 (1989). El Estado, pues, tiene que asegurarse de que *todas* las instituciones pedagógicas del país, tanto públicas como privadas, provean una educación de calidad y que cumplan con unos requisitos mínimos de excelencia en cuanto a currículo, capacidad profesional de la facultad, planta física, recursos de apoyo y otros similares. Al emitir una licencia a una institución educativa privada, el Estado acredita que la escuela cumple con las exigencias mínimas y que los estudiantes reciben, al menos, la educación básica que debe recibir todo aquel que luego va a incorporarse a la sociedad de forma productiva. Por eso, en el ejercicio de sus facultades y deberes, el Estado puede válidamente reglamentar la operación de las instituciones educativas privadas, incluso aquellas de carácter religioso que se denominan iglesias-escuelas. Concluir que las instituciones

educativas privadas-religiosas no tienen que estar sujetas a la reglamentación del Estado y que no tienen que cumplir con el requisito de licencia para operar, pondría en grave riesgo la responsabilidad del Estado de velar por que todos los estudiantes del país reciban una educación adecuada. Véase *Fellowship Baptist Church v. Benton*, 620 F.Supp. 308 (S.D.Iowa 1985).

La parte demandante no nos ha presentado razones o argumentos específicos ni ha planteado situaciones particulares que evidencien concretamente cómo es que la ley o el reglamento en cuestión violan su libertad de culto o imponen a las escuelas una carga *sustancial* a la práctica de su religión. La reglamentación creada por el Estado no impone a las instituciones educativas privadas la obligación ni la necesidad de abandonar o modificar sus creencias religiosas. Dichas escuelas están en libertad de adaptar el contenido del currículo al credo de su preferencia y de adoptar los métodos de enseñanza que encuentren más apropiados. Puede desarrollar, además, las actividades extracurriculares complementarias que prefieran. También pueden exigirle condiciones a su claustro que rebasen la mera preparación académica. La reglamentación en cuestión, pues, deja libres amplios espacios dentro del proceso educativo para que las escuelas puedan implantar sus creencias religiosas de diversas maneras sustanciales. Dicha reglamentación para otorgar licencias no dicta pautas sobre la misión particular de las escuelas privadas-religiosas o sobre su orientación filosófica. La filosofía educativa, de carácter humanista o de otra naturaleza que la Ley Núm. 68, *supra*, pueda promover es aplicable a las escuelas públicas, no a las escuelas privadas. Éstas están en libertad de adoptar aquella orientación filosófica que mejor se ajuste a su misión particular. Igualmente, los currículos, los métodos de enseñanza, la formación claustral, las actividades extracurriculares y otros elementos del proceso educativo de cada escuela pueden ser diferentes, no tienen

que ser todos iguales bajo la reglamentación en cuestión, siempre que se cumpla con unos requisitos mínimos para garantizar la mejor educación posible.

Dada la importancia del interés estatal en la educación de sus ciudadanos, debe descartarse la alternativa sugerida por la parte apelante de que cada institución privada esté en la libertad de establecer sus propios criterios para la operación de las escuelas. Ello equivaldría a obligar al Estado a aceptar los criterios que cada institución quiera emplear, sin que importe su calidad o adecuacidad. Resulta obvio que el Estado no podría descansar razonablemente en un sistema de esa índole. La reglamentación estatal vigente, sin embargo, provee un sistema compulsorio de carácter uniforme y de fácil implantación, lo que asegura al Estado que las escuelas han de cumplir con unos requisitos mínimos al operar. Una reglamentación como la de marras ha sido tradicionalmente el mecanismo utilizado para la consecución de los fines del Estado. No encontramos otro mecanismo alterno que pueda aliviar la carga incidental que esta reglamentación pueda imponer a la parte apelante. Otros mecanismos alternos, tales como visitas rutinarias a los planteles escolares, administración de exámenes y evaluaciones a estudiantes y maestros, conllevarían el mismo o mayor grado de participación del Estado en la operación de las escuelas. En todos los casos las escuelas estarían sujetas a operar bajo algún tipo de aprobación del Estado. La reglamentación, en el caso de autos, es un medio razonable mediante el cual se trata de lograr objetivamente que los ciudadanos se eduquen adecuadamente.

En ausencia de una intromisión excesiva con los asuntos de estas iglesias-escuelas en cuanto a su misión y objetivos, currículo, métodos y técnicas de impartir la enseñanza y administración general, sostenemos la validez de la ley y el reglamento impugnados.

## III

Atendida la reclamación de la Asociación y escuelas apelantes, pasemos a resolver la reclamación de la U.P.R. en el otro caso ante nos.

Conforme señaláramos anteriormente, el tribunal de instancia declaró inconstitucional el requisito de admisión a la U.P.R. que exige de todo solicitante haberse graduado de una escuela autorizada para operar en Puerto Rico por el Departamento de Educación, por entender que dicho requisito era contrario a la cláusula de igual protección de las leyes y por incidir, impermisiblemente, sobre el derecho constitucional a la educación. El tribunal de instancia concluyó que se aplicaba el requisito de admisión discriminatoriamente porque a los estudiantes procedentes de escuelas superiores de Estados Unidos o del extranjero no se les exigía requisitos de licenciamiento o acreditación respecto a sus escuelas de origen como se les exigía a los de Puerto Rico. Erró el foro a quo en su determinación.

Reiteradamente hemos resuelto que la cláusula constitucional que garantiza la igual protección de las leyes no exige un trato igual a todos los ciudadanos; sólo prohíbe un trato desigual e injustificado. Para determinar si una clasificación se ajusta a las exigencias de la igual protección de las leyes, hemos sometido dicha clasificación a uno de dos (2) clases de escrutinio: el racional y el estricto. Bajo el escrutinio racional, la clasificación será válida si persigue un fin legítimo del Estado y existe un nexo racional entre cualquier propósito legislativo concebible y la clasificación. *M. & B.S., Inc. v. Depto. de Agricultura*, 118 D.P.R. 319 (1987). Por el contrario, bajo el escrutinio estricto la ley será válida si existe un interés apremiante o de superior jerarquía del Estado y la clasificación promueve precisamente dicho interés. *Zachry International v. Tribunal Superior*, 104 D.P.R. 267 (1975); *Berberena v.*

*Echegoyen*, 128 D.P.R. 864 (1991). La modalidad del escrutinio aplicable dependerá de la naturaleza de los derechos afectados por la clasificación. Aplica el escrutinio estricto si la legislación apareja una de las llamadas clasificaciones sospechosas o si afecta un derecho fundamental; todas las demás clasificaciones se examinarán bajo el escrutinio racional. Son sospechosas todas las clasificaciones fundamentadas en raza, color, sexo, nacimiento, condición social, ideas políticas o religiosas y nacionalidad. Art. II, Sec. 1 de la Constitución del E.L.A., L.P.R.A., Tomo 1; *Wackenhut Corp. v. Rodríguez Aponte*, 100 D.P.R. 518 (1972). Son derechos fundamentales los arraigados en la Constitución. *León Rosario v. Torres*, 109 D.P.R. 804 (1980).

 El caso de autos debe analizarse a base del escrutinio racional. El requisito de admisión a la U.P.R. que se impugna no está formulado sobre bases que aparejen una clasificación sospechosa. Tampoco afecta derecho fundamental alguno, constitucionalmente hablando, ya que el derecho a la educación consagrado en nuestra Constitución es un derecho de contornos limitados y no se extiende al ámbito de la educación universitaria.

El Art. II, Sec. 5 de la Constitución del Estado Libre Asociado, L.P.R.A., Tomo 1, ed. 1982, pág. 271, dispone en lo pertinente:

> Toda persona tiene derecho a una educación que propenda al pleno desarrollo de su personalidad y al fortalecimiento del respeto de los derechos del hombre y de las libertades fundamentales. Habrá un sistema de instrucción pública el cual será libre y enteramente no sectario. La enseñanza será gratuita en la escuela primaria y secundaria y, hasta donde las facilidades del Estado lo permitan, se hará obligatoria para la escuela primaria.

 Dicha disposición evidentemente no declara que existe un derecho a obtener del Estado una carrera universitaria. El propósito principal de la cláusula es definir las aspiraciones colectivas sobre la educación y crear

un sistema de enseñanza pública a niveles primario y secundario exclusivamente. El lenguaje utilizado en el citado artículo y el claro historial de esta disposición en la Convención Constituyente indican, sin lugar a dudas, que el derecho a la educación allí reconocido se limita a la educación a niveles primarios y está sujeto a que el Estado tenga los recursos necesarios para su implantación.([9])

Como la Constitución no consagra un derecho a la educación universitaria, no podemos afirmar que existe en este caso un derecho fundamental que apareje la aplicación del escrutinio estricto sobre la igual protección de las leyes. Las expresiones sobre el derecho a la educación hechas por este Tribunal en el caso *Pagán Hernández v. U.P.R.*, 107 D.P.R. 720 (1978), tampoco tienen el efecto de extender o crear en Puerto Rico un derecho a la educación universitaria. Erró el tribunal de instancia al analizar la

---

([9]) Entre algunos de los delegados a la Convención Constituyente surgió una preocupación sobre el alcance de la palabra "derecho" dentro de la Sec. 5 del Art. II y si se pretendía crear o no un derecho que fuera exigible judicialmente frente al Estado. Transcribimos parte de ese debate, que también refleja que no se pretendía incluir la educación superior dentro del alcance de la sección:

"Sr. ALVARADO: El uso de la palabra 'derecho' en la enmienda que ha propuesto Su Señoría, ¿tiene el alcance de crear un derecho que pueda sea [sic] imponible judicialmente?

"Sr. BRUNET: Este es uno de los tantos derechos que estamos consagrando constitucionalmente.

"Sr. ALVARADO: Quiero decir, el uso de la palabra 'derecho', podría, a una persona que trata de conseguir asiento en una escuela pública, para un niño y los suyos y no lo consigue, por la razón de que no hay ese asiento disponible, ¿le concedería algún recurso judicial, algún derecho que pudiera concretarse en acción específica de los tribunales?

"Sr. BRUNET: No, no es esto lo que estamos tratando de insertar en la constitución. Sí lo estaría el Estado, si se adoptara una segunda enmienda que voy a ofrecer, haciendo además obligatoria la enseñanza en la escuela elemental.

"Sr. ALVARADO: ¿Entonces, esto no sería compelible [sic] en forma alguna? Esto que propone el compañero, es una declaración de la filosofía de la educación.

"Sr. BRUNET: El propósito que persigue la educación.

"Sr. ALVARADO: Esto persigue los propósitos que se persiguen con la educación, que no concede derechos que puedan hacerse efectivos a los tribunales.

"Sr. BRUNET: A qué clase de educación es a la que aspiramos que deben tener los niños puertorriqueños." (Escolios omitidos.) 2 Diario de Sesiones de la Convención Constituyente 1456 (1961).

Para más detalles del resto del debate entre los delegados, véase Diario de Sesiones, *supra*, Vol. 2, págs. 1455–1464.

validez del requisito de admisión bajo el escrutinio estricto por no estar en juego un derecho fundamental. Veamos, entonces, si existe algún problema de igual protección bajo el escrutinio racional.

Como parte de los requisitos para solicitar admisión a la U.P.R., esta institución exige que los estudiantes solicitantes sean graduados de una escuela superior acreditada y autorizada para operar en Puerto Rico por el Departamento de Educación o mediante examen de equivalencia del Departamento de Educación.([10]) Si el estudiante procede de una escuela superior de Estados Unidos, éste debe someter evidencia de la acreditación de la escuela por la Junta de Educación del estado correspondiente.

El requisito exigido por la Universidad se fundamenta en las disposiciones contenidas en el Art. II-1 de la Ley Núm. 49, *supra*, 18 L.P.R.A. sec. 2111, que dispone:

> Será compulsorio el que toda institución educativa privada en los niveles preescolar, elemental, secundario, vocacional, técnico o postsecundario no universitario que pretenda operar en el Estado Libre Asociado de Puerto Rico obtenga una licencia del Secretario de Instrucción Pública de Puerto Rico. El Secretario de Instrucción Pública, en adelante denominado el Secretario, tendrá la autoridad exclusiva para extender licencias para autorizar el establecimiento y operación de las instituciones educativas privadas indicadas en esta sección.

Además, el Art. III-3 del mismo cuerpo de ley dispone que:

> Ningún departamento, instrumentalidad, oficina, junta, negociado o comisión del Gobierno del Estado Libre Asociado de Puerto Rico podrá hacer determinaciones, autorizaciones o acreditaciones de instituciones educativas o reconocer o acreditar grados, diplomas, certificados o cursos pertinentes a los asuntos cubiertos en este Capítulo. 18 L.P.R.A. sec. 2133.

---

([10]) Dicho requisito fue exigido en el Manual de Instrucciones y Solicitud de Admisión en las versiones publicadas para los años 1990 al 1992 e incluso aparece publicado en la versión de 1993.

La U.P.R. aprobó el requisito en cuestión, tanto para cumplir con las disposiciones legales aludidas, que forman parte de la política pública del país sobre educación, como para facilitar el cumplimiento de su propia misión académica. Es bien conocido que la U.P.R. cuenta con recursos limitados para realizar sus encomiendas. Debido a ello, ha adoptado normas y reglamentos para administrar eficientemente sus recursos y así hacer posible su misión de desarrollar la riqueza intelectual del país, sobre todo de aquellos integrantes provenientes de los estratos menos favorecidos. Art. 2 de la Ley Núm. 1 de 20 de enero de 1966 (18 L.P.R.A. sec. 601). Parte de esta tarea ha sido la de decidir institucionalmente cuáles de sus aspirantes a admisión satisfacen unas exigencias mínimas de preparación y conocimientos académicos, para así darle cabida a los mejores cualificados. Como parte de este proceso, la U.P.R. descansa en un criterio uniforme y de corroboración asequible para pasar juicio sobre la formación de sus aspirantes. Esta garantía consiste precisamente en la licencia que expide el Departamento de Educación.[11] La licencia constituye el aval que acredita que el estudiante cursó estudios en una institución académica que, al menos, cumplía con unas normas mínimas de calidad. Además, le garantiza a la U.P.R. que el estudiante que solicita la admisión ha recibido una instrucción que cubría determinadas materias y tópicos que se estiman necesarios y que contaba con las facilidades para suplir la enseñanza curricular, tales como laboratorio y biblioteca.

Sin el requisito aquí en cuestión, sería muy difícil para la U.P.R. poder distinguir con certeza entre aquellos estudiantes aptos para ser acreedores a una instrucción post secundaria y los que no lo son. Sin dicho requisito se crea-

---

[11] En su alegato la U.P.R. señala que el examen de admisión (*College Board*) no constituye una garantía de preparación del estudiante. Este examen sólo mide unas destrezas elementales y es utilizado para diferenciar candidatos. El propósito primordial del examen es distinguir los mejores candidatos dentro del universo de aspirantes.

ría el grave riesgo de que la U.P.R. hiciese adjudicaciones de admisión en forma inconsecuente y arbitraria, dada la ausencia de un esencial parámetro uniforme que rija el proceso de selección de estudiantes.

Por otro lado, la anulación del criterio de admisión en controversia, en gran medida desvirtuaría los propósitos y la política pública contemplada en la Ley Núm. 31, según enmendada, *supra*. Si la U.P.R. viniera obligada a admitir estudiantes de escuelas sin licencia, no habría un incentivo real para que los colegios se sometieran al proceso de licenciamiento del Departamento de Educación. La autoridad del Departamento de Educación para licenciar escuelas sería entonces fútil. Es evidente, pues, que el requisito de admisión en cuestión persigue un fin legítimo del Estado.

El requisito de admisión, además, se aplica válidamente a todos los solicitantes de admisión de la U.P.R. No existe, por ende, ningún tipo de discrimen. Todos los egresados de escuelas en Puerto Rico son tratados igualmente. La "clasificación" percibida por el tribunal de instancia de que los egresados de, escuelas fuera de Puerto Rico no son tratados igual que los de las escuelas de Puerto Rico no afecta a los demandantes, que son graduados de escuelas de la isla; y además, las diferencias en la aplicación del requisito de admisión entre unas y otras son enteramente racionales. Los que proceden de escuelas de Estados Unidos y países extranjeros son considerados según unas normas *análogas* a las aplicadas a los egresados de escuelas de Puerto Rico. Si provienen de escuelas *públicas* de Estados Unidos, dichas escuelas están avaladas por el gobierno estatal que regula, opera y administra dichas instituciones. Si provienen de escuelas privadas de Estados Unidos, se les exige que muestren evidencia de que la escuela está licenciada o acreditada por el estado de origen.[12] Si provienen de ins-

---

[12] En su alegato, la U.P.R. señala que recibe muy pocas solicitudes de estudiantes provenientes de escuelas privadas de Estados Unidos en todas sus unidades académicas.

tituciones educativas de países extranjeros, se les requiere prueba de que las instituciones gozan de reconocimiento oficial. Finalmente, si el estudiante procede de una escuela de alguna jurisdicción que no licencia o aprueba sus escuelas, el estudiante tiene que tomar un examen de equivalencia que ofrece el Departamento de Educación de Puerto Rico.

Los estudiantes graduados de escuelas que operan en Puerto Rico presentan unas características similares, a saber, que: adquirieron su educación en escuelas que operan bajo el Departamento de Educación; recibieron una educación principalmente en español, salvo los colegios donde el inglés predomina; tomaron una serie de cursos que son particulares de Puerto Rico, como sería el caso de los cursos de literatura e historia puertorriqueña, y lograron su formación social en nuestro ambiente cultural. A los estudiantes provenientes de fuera de Puerto Rico no se les puede exigir requisitos idénticos, pues evidentemente estos alumnos provienen de un medio educativo diferente del nuestro. Es válido, por lo tanto, imponerle a los egresados de Puerto Rico el requisito de admisión en cuestión y a los estudiantes de afuera exigirles un requisito *análogo*, que tiene leves variantes respecto al de Puerto Rico con arreglo a las distintas circunstancias de cada caso. No es irrazonable ni arbitrario que a los estudiantes provenientes de Estados Unidos o países extranjeros se les exija que la escuela de origen esté acreditada o licenciada por las autoridades educativas de su propia jurisdicción, mientras que a los estudiantes de Puerto Rico se les requiere que su escuela esté licenciada por el Departamento de Educación. Sería inmanejable, innecesario y hasta ilegal que la U.P.R. intentase evaluar las escuelas de otras jurisdicciones, en sustitución de la evaluación que hacen las autoridades educativas de éstas. En síntesis, el requisito es el mismo, con la única e inexorable variación de que el organismo que expide la licencia o acredita es diferente, de acuerdo con el

lugar de procedencia del solicitante. Se trata, pues, de una reglamentación racional que persigue un legítimo e importante interés estatal. No hay aquí una falta a la igual protección de las leyes.

## IV

Por los fundamentos antes expuestos, *se revoca la sentencia parcial dictada por el tribunal de instancia en que declara inconstitucional el requisito de admisión a la U.P.R. aquí discutido. Se confirma la sentencia mediante la cual el tribunal, a quo, desestimó la reclamación en la que se impugnaba la validez de la Ley Núm. 31, supra.*

El Juez Asociado Señor Negrón García no intervino.