Opinión disidente emitida por la
Juez Asociada Señora Ro-dríguez Rodríguez.
Disiento de la decisión que hoy anuncia este Tribunal por considerar que la mayoría no ha aplicado correcta-mente la normativa sobre el mandamus y cuándo procede su expedición. Considero que no es un deber ministerial del Secretario de Educación la exigencia que recoge la Ley Núm. 146 de 10 de agosto de 2000, de nombrar cierto nú-mero de maestros de educación física para el sistema de educación pública del país. Pero aun cuando en efecto se tratara de un deber ministerial, no procedería librar el auto solicitado ante el impacto que su concesión tendría sobre el interés público. Este último factor no ha sido so-pesado adecuadamente por la mayoría, a pesar de ser el criterio de mayor importancia y peso al momento de conce-der el auto.
I
El 17 de noviembre de 2003 la Asociación de Maestros de Puerto Rico (Asociación), en representación de sus aso-ciados, maestros de educación física, presentó una petición de mandamus ante el Tribunal de Primera Instancia en contra del entonces Secretario de Educación, Hon. César Rey Hernández, en su carácter oficial. En la demanda ins-tada se alegó que el Secretario incumplía un deber ministerial establecido en la ley orgánica del Departamento de *290 Educación (Departamento) al no nombrar un maestro de educación física por cada doscientos cincuenta estudiantes. Se adujo que el incumplimiento con ese deber ministerial afectaba los intereses de los demandantes así como del es-tudiantado en general.
La petición de mandamus no informaba que se le hu-biese hecho un requerimiento previo al Secretario de Edu-cación para que cumpliera con su deber ministerial y de que éste se negara a ello. La demanda no indicaba, ade-más, por qué no era necesario hacer tal requerimiento.
El 29 de enero de 2004 el Departamento compareció ante el foro primario y contestó la petición de mandamus. En su contestación argüyó que a partir del 2001 se había iniciado un proceso escalonado para llenar las plazas nece-sarias para ofrecer la materia de educación física según lo dispuesto en la Ley Núm. 146 de 10 de agosto de 2000 (Ley Núm. 146). Se indicó en el escrito presentado que a ese momento ya se habían logrado contratar los servicios de 2,715 profesores en esta materia. Se señaló que para cum-plir con lo exigido por la Asociación se tendrían que contra-tar mil maestros adicionales, lo que representaba, en ese momento, una carga onerosa para el Departamento. Por último, se apuntó en la contestación que ya que el Depar-tamento había cumplido con los requisitos mínimos de la Ley Núm. 146 y, ante la necesidad de administrar sabia-mente sus recursos, era improcedente que se expidiese el auto de mandamus.
Posteriormente, la Asociación presentó una solicitud de sentencia sumaria. El Departamento se opuso al reiterar que no se había negado a cumplir con las disposiciones de la Ley Núm. 146, sino, más bien, que su situación presu-puestaria dificultaba el reclutamiento adicional de maestros de educación física. El 15 de octubre de 2004, el foro de instancia dictó una sentencia mediante la que concedió el remedio solicitado por la Asociación. En la sentencia dic-tada se le ordenó al Departamento que sometiera un plan *291 de nombramientos que tuviese como objetivo cumplir con lo dispuesto en la Ley Núm. 146.
Inconforme, el Departamento acudió ante el Tribunal de Apelaciones. Este foro dictó una sentencia revocatoria. El Tribunal de Apelaciones, basándose en la responsabilidad del Secretario de establecer y administrar el presupuesto del Departamento, además de establecer los términos y las condiciones de cómo se llevará a cabo el reclutamiento del personal que compondrá el sistema, concluyó que se tra-taba de un deber discrecional y no ministerial del Secretario. En apoyo de su conclusión, dicho foro indicó que “la determinación que haga el Secretario de Educación en cuanto a nombrar los maestros ... conlleva un análisis de juicio, evaluativo y programático del presupuesto que le toca administrar. [Se trata] de una determinación que con-lleva la discreción administrativa según la realidad presu-puestaria del Departamento”. Apéndice del Certiorari, pág. 11.
En desacuerdo, la Asociación acudió ante este Foro. Hoy, este Tribunal revoca al foro intermedio y dictamina que procedía librar el auto de mandamus solicitado tal y como lo había resuelto el foro de instancia. Por considerar des-acertada la postura del Tribunal, disiento del criterio mayoritario.
II
Como sabemos, el auto de mandamus, por disposición expresa de ley, es altamente privilegiado y de naturaleza discrecional. 32 L.P.R.A. see. 3421. Véase Acevedo Vilá v. Aponte Hernández, 168 D.P.R. 443, 454-455 (2006), y casos allí citados. Se expide para ordenar a una persona o perso-nas naturales, a una corporación o a un tribunal de inferior jerarquía, a que cumpla o ejecute un acto que forma parte de sus deberes y atribuciones “cuando ese deber no admite discreción en su ejercicio, sino que es ministerial”. (Escolio *292 omitido.) D. Rivé Rivera, Recursos Extraordinarios, San Juan, 2da ed., Programa de Educación Jurídica Continua de la Universidad Tnteramericana de Puerto Rico, 1996, pág. 107. Véase 32 L.P.R.A. sees. 3422 y 3423. Véase, tam-bién, J. Cuevas Segarra, Tratado de Derecho Procesal Civil, San Juan, Pubs. J.T.S., 2000, T. II, pág. 925 y ss. Con-secuentemente, como asunto de umbral, hay que determinar si la actuación que se exige, en este caso del Secretario, constituye un deber de naturaleza ministerial. Para ello hay que preguntarse entonces: ¿qué es un deber ministerial?
Un acto o deber es ministerial cuando la ley prescribe y define el deber que tiene que ser cumplido de forma tal que no le permite al funcionario el ejercicio de la discreción o del juicio sobre si cumple o cómo cumple con ese deber impuesto. Partido Popular v. Junta de Elecciones, 62 D.P.R. 745, 749 (1944). Si por el contrario, el funcionario “tiene alguna discreción para ejecutar el acto o en la ma-nera de ejecutarlo, entonces no debe librarse el auto de mandamus ...”. Pagán v. Towner, 35 D.P.R. 1, 2-3 (1926). Para precisar qué constituye un deber ministerial se re-quiere algo más que la aplicación mecánica de una fórmula inflexible. En Hernández Agosto v. Romero Barceló, 112 D.P.R. 407, 418 (1982), indicamos que la determinación de la existencia de ese deber ministerial “es [una] cuestión sujeta a interpretación judicial que no depende de un juicio [a priori] fundado exclusivamente en la letra del estatuto. Tal determinación ha de surgir del examen y análisis de todos los elementos útiles a la función interpretativa; del ‘examen paciente y riguroso que parte de la letra de la ley y evalúa todos los elementos de juicio disponibles para así descubrir el verdadero significado y propósito de la dispo-sición legal’ ”. Ello supone, a mi juicio, que no bastará con una lectura aislada de la disposición legal cuyo cumpli-miento se exige.
*293 Por otro lado, y como habíamos indicado, la ley define al auto de mandamus como privilegiado, lo que implica que éste no procede como cuestión de derecho sino que su ex-pedición descansa en la sana discreción del tribunal. He-mos indicado previamente que la discreción judicial “no significa poder para actuar en una forma u otra, haciendo abstracción del resto del Derecho ...”. Pueblo v. Sánchez González, 90 D.P.R. 197, 200 (1964). En Pueblo v. Ortega Santiago, 125 D.P.R. 203, 211 (1990), indicamos que el ade-cuado ejercicio de la discreción judicial “está inexorable e indefectiblemente atado al concepto de la razonabilidad”. (Enfasis en original.) A fin de cuentas, “[d]iscreción es, pues, una forma de razonabilidad aplicada al discerni-miento judicial para llegar a una conclusión justiciera ...”. (Énfasis suprimido.) íd.
En Noriega v. Hernández Colón, 135 D.P.R. 406 (1994), identificamos varios factores que se deben considerar al ponderar si se libra el auto, identificado ya el deber ministerial. Allí indicamos que entre los factores a conside-rar se encuentran “el posible impacto que éste pueda tener sobre los intereses públicos que puedan estar envueltos; el evitar una intromisión indebida en los procedimientos del poder ejecutivo, y que el auto no se preste a confusión o perjuicios de los derechos de terceros”. íd., pág. 448. Sobre el primero de los factores —el impacto sobre el interés pú-blico— señalamos que era “[e]Z factor de mayor importan-cia y peso” (Énfasis nuestro.) íd. Véase, además, Báez Galib y otros v. C.E.E. II, 152 D.P.R. 382, 392 (2000). Véase, también, C. Antieau, The Practice of Extraordinary Remedies: habeas corpus and the other common law writs, Nueva York, Oceana Publications, 1987, Vol. I, pág. 303 (“Mandamus is denied when it is sought to compel performance of an act that would be contrary to public policy”). Con lo cual, cuando se determine que los intereses públicos se perjudicarán si se libra el auto solicitado, el tribunal *294 debe negar su expedición. No hay duda que ínsito a nues-tra función judicial, está considerar las repercusiones que sobre la cosa pública han de tener nuestros dictámenes. De igual manera, debemos evitar inmiscuirnos, indebida-mente, en procedimientos atinentes al Poder Ejecutivo y Legislativo.
Dada la naturaleza privilegiada del auto de mandamus, su concesión debe estar precedida, necesariamente, por el más sosegado y afinado análisis de todos los intereses com-prendidos en la controversia. En el caso paradigmático, Dávila v. Superintendente de Elecciones, 82 D.P.R. 264, 283-284 (1960), lo expresamos de la manera siguiente:
Para que deba expedirse un auto de mandamus, sin embargo, no es suficiente que el peticionario tenga un derecho claro a lo que solicita y que el demandado tenga la obligación correspondiente de permitir el ejercicio de ese derecho. Se trata de un auto “altamente privilegiado” ... y los tribunales tienen necesariamente que medir todas las circunstancias concurrentes, tanto al determinar si debe o no expedirse el auto como al fijar el contenido de la orden, una vez resuelta en la afirmativa. En otras palabras, el remedio no se concede ex debito justitiae y tan pronto se reconoce el derecho del peticio-nario, sino únicamente cuando el tribunal esté convencido de que se cumplirán propósitos de utilidad social e individual. Para esos fines, es indispensable estimar qué efectos tendrá la orden en el adecuado cumplimiento de las responsabilidades del funcionario afectado por ella y hasta qué punto habrá de beneficiar al solicitante. Procede, en síntesis, establecer el más fino equilibrio posible entre los diversos intereses en conflicto.
De otra parte, el procedimiento para la expedición de un mandamus ante el Tribunal de Primera Instancia está pre-ceptuado en la Regla 55 de Procedimiento Civil, 32 L.P.R.A. Ap. II, y nuestra jurisprudencia interpretativa. En cuanto a los requisitos del contenido de las alegaciones de una solicitud de mandamus, hemos exigido que en ésta el peticionario describa claramente cuál es ese deber ministerial cuyo cumplimiento se exige así como la fuente legal para el mismo. También hemos exigido que se alegue en la *295 petición que se le hizo un requerimiento previo al deman-dado de que cumpla con lo que se estima es un deber ministerial. Véanse: Carro v. Matos, 67 D.P.R. 464 (1947); Medina v. Fernós, Comisionado, 64 D.P.R. 857 (1945); Pluguez v. Junta de Retiro, 50 D.P.R. 693 (1936); Müllenhoff & Körber v. Quiñones et al., 4 D.P.R. 61 (1903); El Municipio de Aguadilla v. Am. R.R. Co. et al., 30 D.P.R. 895 (1922).
Sobre este requisito, en Negrón et al. v. El Superintendente de Elecciones, 11 D.P.R. 366, 374 (1906), indicamos lo siguiente:
Además, está bien establecido por las resoluciones de las más respetables cortes que antes de poder dictarse el auto de mandamus, es preciso que se solicite del funcionario el ejercicio del acto, o de la persona que tiene la obligación de ejercerlo, negándose tal funcionario o persona a cumplir con el deber que le impone la ley. Se concede universalmente que, es la regla general, que es necesaria tal solicitud, y la negativa del deman-dado para que proceda dictar el auto de mandamus. Dicha negativa debe ser, o directamente, o por conducta de la cual puede desprenderse conclusivamente dicha negativa, siendo derecho del demandado que se le dé una oportunidad de hacer o de negarse a hacer lo que se le exige antes de recurrir a la corte para obligarle a ello. ...
Siendo necesario en primer lugar tal requerimiento y nega-tiva, para poder dictarse el auto de mandamus, es preciso que aparezca, mediante las debidas alegaciones en la solicitud, y a menos gue aparezca así, la petición es defectuosa de modo fatal. (Enfasis nuestro.) En igual sentido, véanse: Zavala et al. v. El Consejo Ejecutivo de Puerto Rico, 9 D.P.R. 211 (1905); Morales v. Wilson et al., 16 D.P.R. 751 (1910); Alemañy v. Gómez, Registrador, 39 D.P.R. 635 (1929); Feliciano v. López, Presidente Asn. Fondo de Ahorro, 48 D.P.R. 530 (1935); Medina v. Fernós, Comisionado, ante; Suárez v. Corte, 65 D.P.R. 850 (1946).
Recordemos que el mandamus es un recurso extraordi-nario y sólo procede en situaciones excepcionales. Su con-cesión inmiscuye al Poder Judicial en el quehacer diario de la Rama Ejecutiva o la Legislativa ya que se le va a orde-nar a uno de sus funcionarios que ejecute cierto acto. Ello aconseja cautela. Nuestra exigencia de que se alegue en la *296 petición que se ha interpelado al demandado es manifesta-ción de esa cautela.
Si bien la regla general es que se requiere la interpela-ción del demandado antes de considerar una solicitud de mandamus, hemos elaborado excepciones a esta norma. Así, cuando se trata de un asunto de interés público el requerimiento previo es innecesario. En el pasado hemos determinado que casos que involucran asuntos de natura-leza electoral no requieren una notificación previa por ser casos que involucran asuntos de alto interés público. E.g., Torres v. Guánica, 33 D.P.R. 349 (1924); Martínez Nadal v. Saldaña, 33 D.P.R. 721 (1924). En Martínez Nadal v. Saldaña, ante, pág. 736, reconocimos que “existe una distin-ción entre los deberes de carácter público y los deberes de naturaleza particular que afectan solamente a los derechos de individuos. En tales casos la misma ley substituye al requerimiento y la omisión en cumplir el deber requerido es equivalente a una negativa”. Véase Medina v. Fernós, Comisionado, ante.
También hemos determinado que es innecesario hacer un requerimiento previo al demandado cuando se alegue específicamente en la solicitud de mandamus que hacerlo sería inútil porque se hubiese denegado. “ ‘[C]uando la ac-titud del funcionario hacia la cuestión ha sido oficialmente declarada en tal forma que un requerimiento que se le hi-ciera sería inútil e infructuoso, la razón para la regla de que se haga el requerimiento cesa/ ” Medina v. Fernós, Comisionado, ante, pág. 860.
Aunque de ordinario, el craso incumplimiento con el re-quisito de interpelación conllevaría la desestimación de la petición de mandamus, en este caso considero que excep-cionalmente no se debe desestimar la petición instada. La parte demandada no ha planteado en ninguna etapa de los procedimientos que se desestimase el recurso presentado. Por el contrario, ha centrado su discusión en la improce-dencia de la petición por no constituir el deber impuesto *297 uno de naturaleza ministerial. Considero entonces que con su actuación ha renunciado a este planteamiento. Además, tomando en cuenta la etapa procesal en que nos encontra-mos, y ante la posición clara del Departamento, soy del criterio que no serviría ningún propósito práctico desesti-mar la petición de mandamus.
Pasemos ahora a evaluar las disposiciones de ley orgá-nica del Departamento, con particular atención a lo dis-puesto en la Ley Núm. 146 y el alegado deber ministerial que ésta le impone al Secretario.
III
A. Sin duda, cualquier análisis sobre el derecho a la educación en Puerto Rico tiene que partir de la Sección 5 de la Carta de Derechos de la Constitución del Estado Li-bre Asociado de Puerto Rico donde se consagra, como dere-cho fundamental de todo ciudadano, el acceso a una ins-trucción pública gratuita. Aquí se dispone:
Toda persona tiene derecho a una educación que propenda al pleno desarrollo de su personalidad y el fortalecimiento del respeto de los derechos del hombre y de las libertades fundamentales. Habrá un sistema de instrucción pública el cual será libre y enteramente no sectario. La enseñanza será gratuita en la escuela primaria y secundaria y, hasta donde las facilidades del Estado lo permitan, se hará obligatoria para la escuela primaria. La asistencia obligatoria a las escue-las públicas primarias, hasta donde las facilidades del Estado lo permitan, según se dispone en la presente, no se interpre-tará como aplicable a aquellos que reciban instrucción prima-ria en escuelas establecidas bajo auspicios no guber-namentales. Art. II, sec. 5, Constitución del Estado Libre Aso-ciado de Puerto Rico. Art. II, Sec. 5, Const. E.L.A., L.P.R.A., Tomo 1, ed. 2008, pág. 292.
Esta disposición constitucional tiene como objetivo “de-finir las aspiraciones colectivas sobre la educación y crear un sistema de enseñanza pública a niveles primario y se-cundario” gratuito, sujeto a la disponibilidad de los recur- *298 sos necesarios para su ejecución. Asoc. Academias y Col. Cristianos v. E.L.A., 135 D.P.R. 150, 168—169 (1994). Y es que los constituyentes fueron conscientes de que a pesar de la necesidad imperiosa de erradicar el analfabetismo que arropaba al país, el compromiso del Estado de conferirle plena eficacia al mandato constitucional previamente transcrito tenía que estar sujeto a que las circunstancias económicas de Puerto Rico permitiesen su realización. 2 Diario de Sesiones de la Convención Constituyente 1462— 1476 (ed. 1961).
Para instrumentar las aspiraciones contenidas en el mandato constitucional, la Asamblea Legislativa aprobó en 1990 una ley orgánica para el Departamento de Educación (Ley Núm. 68 de 28 de agosto de 1990). Este estatuto hizo compulsorio en Puerto Rico la enseñanza de un curso de educación física én todos los grados del sistema de instruc-ción pública. Posteriormente, al aprobarse una nueva ley orgánica para el Departamento en 1999, Ley Núm. 149 de 15 de julio de 1999, conocida como Ley para el Desarrollo de las Escuelas de la Comunidad, se dejó fuera el requisito de enseñanza del curso de educación física. Para remediar tal omisión, se enmendó la ley orgánica del Departamento mediante la Ley Núm. 146 para reinsertar la educación física al currículo del Departamento. Véase Exposición de Motivos de Ley Núm. 146 de 10 de agosto de 2000, Leyes de Puerto Rico, pág. 980.
Como hemos indicado, la controversia en este caso se relaciona con el alcance de las disposiciones de la Ley Núm. 146 y la responsabilidad que ésta impuso sobre el Secretario como resultado de las enmiendas que introdujo a la ley orgánica del Departamento. Así, la Ley Núm. 146 estableció que la escuela debe ayudar a sus alumnos a, entre otras cosas, “[a]dquirir conciencia de la necesidad de desarrollo de una buena condición física, haciendo énfasis en la importancia de ser saludables, tanto en su dimensión física como en la mental y espiritual”. 3 L.P.R.A. sec. 143a *299 n. Se reconoció, además, que las escuelas deben asignar salones e instalaciones adecuadas para cursos regulares de educación física y de bellas artes. 3 L.P.R.A. sec. 143g(s). El Secretario, por su parte, incluirá como parte del currículo básico para el sistema de instrucción pública cursos de educación física. 3 L.RR.A. sec. 145t(c). Para materializar la enseñanza de la educación física, integrada como requi-sito al currículo básico, la ley dispone:
Las escuelas proveerán a todos sus estudiantes con un mí-nimo de tres (3) horas semanales de educación física. Se ga-rantizará un maestro de educación física a cada escuela. Para el caso de escuelas con más de doscientos cincuenta (250) es-tudiantes se nombrarán maestros adicionales por cada dos-cientos cincuenta (250) estudiantes o fracción. 3 L.P.R.A. see. 143c-l.
La controversia que nos ocupa en esta ocasión, como ya indicamos, gira en torno a esta última disposición. Nuestra tarea consiste en analizar la ley orgánica del Departa-mento en su conjunto para así calibrar el alcance de las enmiendas que la Ley Núm. 146 le introdujo.
B. La Ley Núm. 149, ley orgánica del Departamento, dispuso para un nuevo modelo educativo en nuestro país con la creación de las llamadas escuelas de la comunidad. La ley le confiere a las escuelas de la comunidad autono-mía para decidir sobre sus asuntos académicos, fiscales y administrativos dentro de los límites que la propia ley establece. Ello, no obstante, la ley “no prevé que cada es-cuela sea un universo aparte, sin vínculos con las demás y fuera de la jurisdicción del Departamento”. Art. 1.02e de la Ley Núm. 149, ante, pág. 525. Todo lo contrario, todas las escuelas que conforman el sistema de educación pública están bajo la jurisdicción del Secretario, quien establece la pauta general lo que imparte coherencia al sistema educa-tivo como un conjunto. Id. Ninguna de las disposiciones de la ley “menoscaba la autoridad que la Constitución le otorga al Secretario para dirigir la educación pública en *300 Puerto Rico”. íd., pág. 526. Así, aun cuando algunas de las funciones administrativas de las escuelas de la comunidad le hayan sido transferidas del nivel central, éstas deberán seguir el ordenamiento normativo que establezca el Secre-tario de Educación para el sistema de enseñanza pública en general. íd. Véase 3 L.P.R.A. sec. 143a(e) n.
Como sabemos, el Secretario, funcionario de rango cons-titucional, es la figura principal en el Departamento de Educación. Es el oficial llamado por la ley a encauzar “la gestión educativa del Sistema a través de normas regla-mentarias, de directrices de política pública y de activida-des de planificación, auditoría, fiscalización y evaluación de los procesos académicos y administrativos de las escuelas”. 3 L.P.R.A. sec. 145e. Entre las responsabilidades generales que le confiere la ley al Secretario con respecto a las escuelas se encuentran, entre otras: “[o]rganizar, plani-ficar, dirigir, supervisar y evaluar las actividades académi-cas y administrativas del Departamento”, 3 L.P.R.A. see. 145s; la planificación fiscal para todo el sistema de educa-ción pública y la asignación presupuestaria a cada escuela, así como también la evaluación, auditoría o fiscalización de cualquier otra actividad que las escuelas desarrollen den-tro del ámbito de la autonomía que la ley les confiere. 3 L.P.R.A. sec. 145f. Además, tiene la obligación de formular normas de aplicación general a todas las escuelas, que pro-picien la coherencia en la gestión educativa del sistema de enseñanza pública. 3 L.P.R.A. sec. 145o.
El Secretario, como director académico del sistema, de-berá establecer un currículo básico para el sistema de edu-cación “con márgenes de flexibilidad suficiente para que las escuelas lo adapten a sus necesidades ...”. 3 L.P.R.A. sec. 145u(c). Aprobará los libros, textos, equipos y materia-les requeridos para la docencia. 3 L.P.R.A. sec. 145t(l). Es-tablecerá un plan de desarrollo integral de cinco años donde se establecen los objetivos a corto y mediano plazo. Véanse: 3 L.P.R.A. sec. 145u (a),(b),(c),(e),(m),(n),(p),(w) y *301 (x). Entre otras cosas, este plan debe proyectar el ofreci-miento de cursos de educación física al estudiantado, así como ofrecer cursos de moral y ética gubernamental; desa-rrollar programas de orientación referente a la criminali-dad, las leyes penales y la seguridad en el tránsito; crear proyectos de estudios avanzados y velar por el cumpli-miento de los programas de estudiantes con impedimentos. 3 L.P.R.A. sec. 145t(e)-(bb). Para ello, necesariamente, se le ha provisto al Secretario con amplio margen de discreción.
En su función de director administrativo del sistema de educación pública, la ley orgánica provee que el Secretario debe adoptar la fórmula correspondiente para determinar el presupuesto de las escuelas que componen el sistema de educación pública, así como también el presupuesto del Departamento. 3 L.P.R.A. sec. 145u(n). En cuanto a la pri-mera gestión, deberá tomar en cuenta, discrecionalmente, entre otros, los factores siguientes: el nivel de ofrecimien-tos de la institución, su matrícula, la naturaleza de sus programas, la antigüedad de la facultad, y el estado de las facilidades físicas. 3 L.P.R.A. sec. 145u(a). Además, el Se-cretario es el responsable de administrar el sistema de personal del Departamento, tanto el docente como el no docente. 3 L.P.R.A. sec. 145u(j).
Aquí hay que destacar la importancia de preparar un presupuesto en la gestión de una agencia o un gobierno. Así, hemos señalado en el pasado que el presupuesto del Estado es “mucho más que urna contabilización de ingresos y gastos desligado de todo esfuerzo para encauzar la obra de gobierno y lograr alcanzar determinados fines sociales. Es, verdaderamente, un plan de acción gubernamental ex-presado en términos financieros”. Presidente de la Cámara v. Gobernador, 167 D.P.R. 149, 176 (2006) (Rodríguez Ro-dríguez, J., op. disidente). Don Pedro Muñoz Amato soste-nía que el presupuesto “debe ser el programa que dirija toda la actividad gubernamental en su función de orientar los procesos sociales y servir los intereses del pueblo”. P. *302 Muñoz Amato, Introducción a la administración pública, teoría general, planificación-presupuestos, 4ta ed., México, Fondo de Cultura Económica, 1966, pág. 141. Necesaria-mente, su confección conlleva el ejercicio de discreción, ya que los recursos disponibles no son ilimitados, por lo que hay que seleccionar qué programas adelantar, en qué mo-mento y de qué manera, de suerte que se pueda adelantar el plan de obra trazado. M. Popovich, editor, Creating High-Performance Government Organizations, Alliance for Redesigning Government, San Francisco, Jossey-Bass Publishers, 1998, pág. 129 (“With limited funds and virtually insatiable demand for services, public resources must be allocated to meet the public’s priorities”).
Para resumir, según la Ley Núm. 149 es el Secretario de Educación el llamado a establecer la pauta general y el ordenamiento normativo que habrá de regir al sistema de educación pública. Dirige y supervisa todas las actividades académicas y administrativas del Departamento de Educa-ción, para lo cual, necesariamente, debe contar con la dis-creción necesaria para adelantar sus objetivos. En ese sen-tido, no han perdido su vigencia nuestras expresiones en Hernández v. J. Apel. Sist. Educ. Pub., 147 L.P.R.A. 840, 845 (1999), cuando, al interpretar la Ley Núm. 68, señala-mos que el Departamento de Educación constituye un sis-tema integrado, dirigido por el Secretario, quien ejerce las funciones ejecutivas, administrativas, operacionales, de supervisión y planificación de su ley orgánica, para lo cual necesita la flexibilidad necesaria para alcanzar las metas trazadas. El Secretario debe tener discreción para, de forma razonable, orientar los proyectos y metas que su ley orgánica le impone, mediante la preparación de un presu-puesto que refleje su política pública. Así, el presupuesto de la agencia sirve para dirigir esa discreción, de suerte que se alcancen los objetivos delineados. Como ya dijimos, la Ley Núm. 146 no opera en un vacío estatutario al mar-gen de las restantes “obligaciones” que la ley orgánica del *303 Departamento de Educación impone sobre su Secretario, y es en ese contexto que hay que interpretarla.
Con ese marco doctrinal de trasfondo, procede evaluar, con rigor jurídico, la controversia en este caso.
IV
Conforme indicamos inicialmente, la Asociación arguye que el Secretario no tiene discreción para implantar el mandato de la Ley Núm. 146. Insiste que es un deber ministerial de éste nombrar los maestros de educación física necesarios para que todos los estudiantes matriculados puedan recibir el curso de educación física. Nos indica que la educación física “es fundamental para el desarrollo total del joven puertorriqueño [y que] determinar que el nom-bramiento de los maestros de educación física el cual tiene fuerza de ley, es discrecional, penaliza al estudiantado puertorriqueño del beneficio de la política pública guberna-mental de acompañar con igual importancia lo docente con la buena condición física”.
Por otro lado, el Estado Libre Asociado reconoce en su alegato la importancia de los cursos de educación física para el pleno desarrollo del estudiantado. Argumenta, no obstante, que el deber impuesto tiene que analizarse de forma integral, considerando todas las prerrogativas y atribuciones que la ley orgánica del Departamento le con-fieren al Secretario. Indica que el Secretario tiene discre-ción para reclutar el personal adicional —considerando los fondos con que cuente el Departamento— por lo que el de-ber impuesto por la Ley Núm. 146 es discrecional y no ministerial.
El Procurador General nos informa que existen, al pre-sente, 1,523 escuelas de las cuales, 1,090 pertenecen al ni-vel elemental y 433 a los niveles intermedio y superior. Indica, además, que existen 2,764 plazas contratadas con personal docente para ofrecer el curso de educación física, *304 y que en todas las escuelas públicas se imparte el curso de educación física. Sostiene, que a partir del 2001 se llevó a cabo un proceso escalonado de nombramientos para cum-plir con la Ley Núm. 146 que ha conllevado, entre 2001 y 2003, la creación de 726 plazas adicionales de maestros de educación física. Informa, que acceder a lo que solicita la Asociación tendrá un impacto sustancial sobre el presu-puesto de la agencia, y exige del Departamento la creación de cientos de plazas sin que exista la capacidad organiza-tiva ni la infraestructura necesaria para sostenerlo.
Finalmente, llama la atención a la difícil situación fiscal por la que atraviesa el Departamento de Educación y la dificultad práctica que supondría la contratación de nuevo personal. Nos señala, también, que el historial legislativo de la Ley Núm. 146 reflejaba que con su aprobación se vislumbraba la inserción de 1,600 maestros de educación física a un costo estimado, únicamente en nómina, de treinta y dos millones de dólares, exclusivo de gastos en concepto de materiales, inversiones a la infraestructura de los planteles, entre otros. Véase Comunicación de la Aso-ciación de Educación Física y Recreación de Puerto Rico, al Hon. Tomás Bonilla Feliciano, Presidente de la Comisión de Educación y Cultura de la Cámara de Representantes, 7 de marzo de 2000, sobre el P. de la C. 2970.
El Estado concluye al afirmar que “una interpretación razonable de las obligaciones del Secretario en términos del currículo y el gobierno administrativo del Sistema, le impone una amplia facultad para flexibilizar los diversos ofrecimientos del Departamento a los fines de proporcionar el programa más adecuado a la luz de los fondos disponi-bles para la agencia cumplir con sus múltiple obligaciones”. Por lo que no tan sólo la obligación que re-coge la Ley Núm. 146 es de carácter discrecional, “sino que intereses públicos de envergadura exigen la denegación del remedio extraordinario solicitado ...”.
*305 V
A. La inserción de programas de educación física al currículo escolar contribuye al desarrollo integral de la niñez. No tan sólo promueven en el niño su desarrollo fí-sico, sino también apoya la manifestación del niño como sujeto social, favoreciendo la comunicación y relación con sus pares a través del trabajo en equipo y la conformación de grupos. Los cursos de educación física facilitan que los niños aprendan a negociar, acordar, respetar y modificar las reglas que posibilitan la igualdad de oportunidades para todos. Todo lo cual redunda en un desarrollo más pleno del individuo, además de propiciar una escuela ver-daderamente democrática, de convivencia y de participa-ción, de cooperación y de solidaridad, de integración social y pertenencia grupal. Véase A. Nóbile y G. Fedi, La educa-ción física para la escuela primaria, México, Ed. Edilar, 2004. La Ley Núm. 146 persigue alcanzar estos loables ideales.
Dicho esto, no obstante, hay que reconocer que la Ley Núm. 146 no opera en el vacío, sino que establece una de las múltiples responsabilidades que recaen sobre la figura del Secretario, como ya discutimos. Este tiene la responsa-bilidad de adelantar los objetivos de esta ley, al igual que los restantes establecidos en la ley orgánica del Departamento. En atención a ello, es razonable concluir que le corresponde al Secretario establecer las prioridades del Departamento a la hora de darle cumplimiento a la multiplicidad de deberes que le impone su ley orgánica, de suerte que pueda alcanzar los objetivos y las metas trazadas. No podemos, razonablemente, interpretar la Ley Núm. 146 como una camisa de fuerza, rígida e inflexible, que priva al Secretario de toda discreción para establecer las metas y los objetivos del Departamento en función de los fondos con los que efectivamente cuenta. Esto no nos *306 parece una interpretación razonable de la ley orgánica del Departamento.
Nuevamente, el Secretario tiene la responsabilidad de establecer y administrar el presupuesto del Departamento, así como establecer los términos y las condiciones para re-clutar personal. Ello conlleva, necesariamente, un análisis mesurado, juicioso y razonable de cómo confeccionar y ad-ministrar su presupuesto. En otras palabras, contempla el ejercicio de la discreción administrativa de acuerdo con la realidad presupuestaria del Departamento. En esta fun-ción el Secretario tiene la obligación de administrar sabia-mente los recursos disponibles. Tiene razón el Tribunal de Apelaciones cuando asevera: “El Secretario está limitado por la sabiduría de su propio juicio y por su noción de cuá-les son las prioridades presupuestarias. El deber de nom-brar todas las plazas de educación física conforme lo esta-blece la ley es un deber discrecional y su omisión no es remediable mediante el recurso de mandamus.” Adviér-tase, además, que el Departamento ha cumplido con el mí-nimo que dispone la ley al nombrar —al menos— un maestro de educación física por escuela. Como consecuencia, concluiría que el deber que le impone la Ley Núm. 146 al Secretario es discrecional, por lo que no procedía expedir el mandamus solicitado.
Por último, aún si se tratara de un deber ministerial tal y como resuelve la mayoría, considero que su expedición ofende el interés público que es, como ya vimos, el criterio de mayor peso. Este Tribunal no vive ajeno a lo que ocurre a nuestro alrededor. Tomamos conocimiento judicial de que miles de empleados públicos han sido cesanteados por el Gobierno y un número significativo de ellos en el Departa-mento de Educación. Se alega que ello obedece a conside-raciones de índole fiscal y a dificultades presupuestarias que, al momento, no se han podido conjugar. La mayoría, abstraída de esta realidad, obliga al Estado a incurrir en lo que será una erogación millonaria de fondos públicos en el *307 Departamento. Habrá que preguntarse entonces, si para cumplir con la obligación que hoy se le ha impuesto, el Secretario de Educación tendrá que despedir a nuevos em-pleados públicos. Considero, pues, que la mayoría no ha sopesado adecuadamente el criterio de mayor importancia y peso para conceder un mandamus, que es, como ya dis-cutimos, el impacto de su concesión sobre el interés público.
VI
Unas consideraciones finales en cuanto al remedio que dicta el Tribunal en este caso.
La mayoría, advertida de las repercusiones de su dicta-men, ha procedido a diseñar un remedio sui generis que transmuta un remedio en ley (remedy at law) en uno en equidad (remedy in equity). En otras palabras, se ha solici-tado que se dicte un mandamus y este Tribunal ha proce-dido a dictar un injunction. Porque no puedo estar con-forme con esta metamorfosis del remedio, consigno mi desacuerdo. Me explico.
La mayoría intenta paliar el efecto de su dictamen pos-poniendo el cumplimiento con el “deber ministerial del Secretario”. Para ello, “el Secretario deberá diseñar un plan [que suponemos es de nombramientos, aunque no se diga expresamente] que tenga como objetivo cumplir a ca-balidad con el mandato de ley, conforme la capacidad del Departamento”. Una vez iniciado deberá completarse en un plazo de dos años. Lo primero que llama la atención es el término seleccionado por el Tribunal. ¿Qué criterio se utilizó para llegar al término propuesto? ¿Qué llevó al Tribunal a considerar que éste era un periodo de tiempo razo-nable para cumplir con lo que se determinó es una obliga-ción ministerial? ¿Qué factores, del expediente, le permiten al Tribunal dictaminar el plazo?
Por otro lado, al devolver el caso al foro de instancia *308 para que el Secretario proceda —bajo la supervisión del Tribunal de Primera Instancia— a preparar su plan de cumplimiento “conforme a la capacidad del Departamen-to”, este Tribunal parece reconocerle al Secretario cierta discreción sobre cómo cumplir con el mandato de ley; man-dato, que previamente ha concluido es de carácter ministerial. Ello plantea, a nuestro juicio, una contradic-ción que requiere explicación.
Antes bien, independientemente de lo indicado, no hay duda de que este remedio que dicta la mayoría, aun cuando no lo llame así, no es otra cosa que un injunction. No es ésta la ocasión para disertar sobre la naturaleza del reme-dio de mandamus frente a otro remedio extraordinario im-portado del derecho común anglosajón, como es el injunction. Si bien pudiéramos estar de acuerdo o en desacuerdo sobre cuáles deban ser los requisitos de uno frente a otro, lo cierto es que la opinión no explica por qué, si lo que se ha solicitado es un mandamus, es necesario emitir un injunction. Consideramos que en correcta técnica adjudica-tiva se debe atender este asunto explicando el porqué de este mandamus sui generis creado por fíat judicial.
Ya indicamos que el remedio que ha dictado esta Curia es un injunction. Mas no cualquier injunction, sino el que el profesor Owen Fiss ha denominado como un “injunction estructural”. Con este tipo de remedio, los tribunales bus-can aplicar los mandatos constitucionales a los problemas creados o generados por un ente gubernamental. El profe-sor Fiss lo define así:
[T]he formal medium through which the judiciary seeks to reorganize ongoing bureaucratic organizations so as to bring them into conformity with the Constitution. O.M. Fiss, The Allure of Individualism, 78 (Núm. 5) Iowa L. Rev. 965 (1993).
Una de las características principales de este remedio es el rol dinámico que asume el juez en este tipo de litigación, confeccionando un remedio amplio, abarcador y compren-sivo que requiere estrecha supervisión del tribunal en su *309 implementation y cumplimiento. El profesor Abram Cha-yes lo describe de la siguiente manera:
“[PJublic law litigation” ... was designed to emphasize that in such cases the federal courts ... are asked to deal with grievances over the administration of some public or quasi-public program and to vindicate the public policies embodied in the governing statutes or constitutional provisions. As a result, courts are inevitably east in an affirmative, political —activist ... role ....” (Enfasis nuestro y escolios omitidos.) A. Chayes, The Supreme Court, 1981 Term, Foreword: Public Law Litigation and the Burger Court, 96 (Núm. 1) Harv. L. Rev. 4 (1982).
El profesor Dobbs se expresa en igual sentido: “restructuring injunctions are typically complex and invasive. They are likely to involve the judge in tasks traditionally considered to be non-judicial, that is, less about rights and duties and more about management”. D. Dobbs, Law of Remedies, Damages-Equity-Restitution, 2da ed., St. Paul, West Publishing Co., 1993, Sec. 2.9(1), pág. 164.
Consideramos que en este caso, como poco, se requiere una explicación de por qué la determinación que toma no inmiscuye impropiamente a la Rama Judicial en funciones ínsitas a la Rama Ejecutiva, como es diseñar y administrar el presupuesto de una agencia. En otras palabras, hasta qué punto el remedio dictado por el Tribunal viola la sepa-ración de poderes.
Por los fundamentos antes expuestos, disiento del crite-rio mayoritario.
— O —