ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL DE APELACIONES
PANEL ESPECIAL

| | | |
|---|---|---|
| G. Z. G. G por conducto de su padre con patria potestad JONATHAN LUIS GARCÍA SANTANA<br><br>Recurrente<br><br>v.<br><br>DEPARTAMENTO DE EDUCACIÓN<br><br>Recurrido | KLRA202400144 | *Revisión Judicial* procedente del Departamento de Educación<br><br>Querella Núm.: 2324-20-07-00077<br><br>Sobre: Educación Especial |

Panel integrado por su presidenta, la Jueza Ortiz Flores, el Juez Rivera Torres, la Jueza Rivera Pérez y el Juez Campos Pérez

Campos Pérez, Juez Ponente

**SENTENCIA**

En San Juan, Puerto Rico, a 24 de enero de 2025.

La parte querellante y recurrente, la menor G.Z.G.G., comparece ante nos mediante un recurso de revisión judicial. Solicita que dejemos sin efecto parcialmente la *Resolución Final y Orden*, dictada el 23 de febrero de 2024 por la parte querellada y recurrida, el Foro Administrativo de Educación Especial del Departamento de Educación de Puerto Rico (DEPR o recurrido). Mediante la aludida decisión, el DEPR declaró Ha Lugar la solicitud de reembolso para el año escolar 2022-2023, de conformidad con la evidencia de pagos que presentó la recurrente.[1] No obstante, proveyó No Ha Lugar al servicio académico *One-to-One* (en adelante, uno a uno), "por entender que la ubicación de la menor es la adecuada y su progreso es positivo y significativo".[2]

Por los fundamentos que expresaremos a continuación, anticipamos la confirmación del dictamen impugnado.

---

[1] Ello en consonancia con la Carta Circular 09-2014-2015 sobre *Política Pública para el Reembolso de Gastos Educativos y Relacionados cuando la Agencia no ha podido ofrecer una Educación Pública, Gratuita y Apropiada, según requerido por IDEA*.
[2] Apéndice, pág. 58.

Número Identificador

SEN2025 _____

# I.

De las determinaciones fácticas del dictamen y la prueba estipulada se desprende que la menor G.Z.G.G está admitida en el Programa de Educación Especial desde el 2019 (en ese momento, en etapa preescolar),[3] bajo un diagnóstico de Autismo Moderado – Nivel 2. En esencia, la condición afecta su comunicación social, el manejo de emociones y la funcionalidad en su diario vivir. La recurrente amerita un asistente de servicio para su desarrollo en destrezas académicas, higiene, alimentación y seguridad. De hecho, debido a la ausencia de este recurso, el padre de la menor, Sr. Jonathan García Santana (señor García Santana) y la madrastra, Sra. Olga del Mar Reyes Maldonado (señora Reyes Maldonado), la matricularon en el Colegio CADEI Bilingual School, en Moca, durante el año escolar 2022-2023.[4] Allí contó con una asistente de servicios, sin la modalidad uno a uno.

En aquello que nos atañe, el 28 de marzo de 2023, la Dra. Eva Yanet Radinson Pérez (doctora Radinson Pérez) suscribió un *Informe de Evaluación Psicoeducativa*.[5] Para esa fecha, G.Z.G.G. tenía siete años.[6] Entre otras cosas, la psicóloga clínica[7] aconsejó una evaluación neurológica pediátrica para confirmar o descartar algún trastorno de neurodesarrollo, una evaluación psiquiátrica para lidiar con la agresividad mostrada por la menor, así como terapias psicológicas con el propósito de que ésta maneje "emociones y pensamientos asociados a la ausencia de su madre[8] y experiencias vividas que pudieran perturbar su estado anímico manifestadas en

---

[3] Apéndice, págs. 86-88. Véase, además, otra prueba estipulada a las págs. 89-94; 95-97; 98-101; 102-105; 106-111; 112-115; 116-118.

[4] Cabe señalar que la determinación recurrida concedió el reembolso solicitado.

[5] Apéndice, págs. 132-155.

[6] G.Z.G.G. nació el 26 de octubre de 2015.

[7] Apéndice, págs. 80-83.

[8] La madre de la menor no reside en Puerto Rico y su relación con la niña es esporádica. Véase Transcripción de la Prueba Oral (TPO) 8 de diciembre de 2023, pág. 252 líneas 12-18.

rabietas y agresión. En una modalidad individual semanal por razón de 45-60 minutos".[9]

Además, la perita incluyó un sinnúmero de recomendaciones. Entre éstas, en el tercer inciso, refirió a la menor a un servicio académico uno a uno para atender sus dificultades de conducta. La distribución recomendada en un inicio sería del 75% del tiempo lectivo, junto a un 25% en un salón modificado con diez estudiantes. Este arreglo se reduciría de acuerdo con los informes de progreso.

.        .        .        .        .        .        .        .

3. Debido a las **dificultades en conducta** manifestadas en la escuela las cuales han afectado a otros estudiantes y ponen en riesgo a [G.Z.G.G.], se recomienda el servicio académico "One-to-One". Este será con un maestro o maestra certificada en educación especial que tenga experiencia y cursos dirigidos al área de manejo de estudiantes con Trastornos del Espectro de Autismo. **Se le asistirá de manera individual para velar por su seguridad y ayudarla a trabajar su área conductual.** Estos servicios serán integrados a un salón de estudios modificados. Se recomienda que [G.Z.G.G.] esté de manera inicial un 75% de tiempo en este servicio y un 25% en el salón modificado de corriente regular para ayudarla a interactuar con los pares. A medida que el personal de la escuela realice evaluaciones y emita informes de progreso el tiempo en el One to One irá siendo reducido facilitando mayor espacio dentro del salón modificado en corriente regular.[10] (Énfasis nuestro).

.        .        .        .        .        .        .        .

Así las cosas, en el Comité de Programación y Ubicación (COMPU) de 29 de mayo de 2023 se consignó el siguiente informe de progreso:[11]

a) La Sra. Jacqueline Butler funcionaria del CSEE hace lectura del informe de progreso y logros académicos de [G.Z.G.G.] completado por Marisela Castro (maestra regular) en el mismo se describe los logros alcanzados y la ejecución académica.

b) Del informe de progreso se desprende la siguiente información:
   a. [N]o ha participado de ningún programa para atender las necesidades.

---

[9] Apéndice, pág. 148; 152. Durante sus primeros dos años, la menor convivió con su madre biológica en Estados Unidos; véase, Apéndice, pág. 133.

[10] Apéndice, pág. 149.

[11] Apéndice, págs. 119-131. Además, se discutieron los progresos de algunas de las terapias, tales como: oroterapia (disfagia), física, psicológica, ocupacional del habla y lenguaje.

b. Se utilizan las siguientes estrategias para tratar de remediar las dificultades de la estudiante: educación diferenciada, enseñanza con grupos pequeños, ayuda individualizada y acomodos razonables.

c. Acomodos razonables ofrecidos: ubicación del pupitre, letra agrandada, tiempo extra, repetir instrucciones, guiar al estudiante para que inicie tarea.

d. Presenta dificultad para manejar sus emociones. Se frustra fácilmente. Manifiesta episodios frecuentes de gritar, llorar, agredir a compañeros y adultos, rompe papeles y voltea sillas. Conducta retante ante figuras de autoridad.

e. [G.Z.G.G.] domina la lectura, comprensión lectora, identifica palabras y fonemas.

f. [G.Z.G.G.] tiene mucha dificultad para escribir. En ocasiones invierte las letras y se frustra. Generalmente se niega a escribir. Dificultades significativas para producir frases y oraciones de propia autoría con sintaxis correcta.

g. La estudiante domina la suma, resta y sabe las tablas de multiplicar hasta la del nueve (9). Identifica figuras geométricas tridimensionales y planas.

h. [G.Z.G.G.] tiene dificultad para resolver problemas verbales.

i. Notas generales de [G.Z.G.G.]:
   i. Español          A
   ii. Inglés          A
   iii. Matemáticas    A
   iv. Estudios Sociales  A
   v. Ciencia          A

j. [G.Z.G.G.] tiene problemas conductuales significativos. [E]sto afecta adversamente su integración con pares y su ejecución.

c) Posturas de padre con relación al informe de progreso: Jonathan García padre de [G.Z.G.G.] está de acuerdo con el informe académico y de progreso discutidos en el día de hoy.

El servicio educativo uno a uno fue planteado como remedio a las dificultades de conducta de la menor, pero el DEPR no estuvo de acuerdo por ser una alternativa muy restrictiva. En su lugar, en el COMPU se recomendó a tiempo completo un salón especial con promoción de grado y programa regular (SEP Ruta 1) al igual que la inclusión de un asistente de servicios para las necesidades de G.Z.G.G. Sin embargo, los encargados de la menor no aceptaron la ubicación ni la localización. No obstante, informaron que visitarían las cinco escuelas propuestas antes de tomar una decisión.

Según se desprende del COMPU de 5 de julio de 2023,[12] los encargados de [G.Z.G.G.] visitaron las cinco escuelas recomendadas y esgrimieron que ninguna cumplía con las recomendaciones del *Informe de Evaluación Psicoeducativa*. El DEPR insistió en brindar una ubicación adecuada al informe académico de G.Z.G.G. y que ésta fuera lo menos restrictiva para la menor, por lo que expresó su desacuerdo con el uno a uno.

Trabada la controversia, el 24 de julio de 2023, se presentó la *Querella* de autos.[13] En lo que nos compete, en síntesis, se solicitó lo siguiente: la redacción de un Programa de Educación Individualizado (PEI) para atender todas las necesidades de la estudiante, incluyendo servicios educativos, relacionados, complementarios y de seguridad; el cumplimiento con las obligaciones de ley para ofrecer una ubicación gratuita y apropiada conforme con las necesidades de la menor para el año 2023-2024; costear la escuela privada para dicho periodo; y proveer todos los servicios educativos, relacionados y suplementarios que amerita la menor de la forma recomendada e integrada al ambiente escolar. Se peticionó también la imposición de sanciones económicas y no se renunció a la solicitud de honorarios de abogado.

En respuesta, el DEPR instó *Contestación a Querella*.[14] En esencia, respondió que no se oponía a redactar un PEI; ni se había negado a ofrecer los servicios educativos, relacionados y suplementarios a la menor, según determinados en el PEI. Acerca de la ubicación y localización, el DEPR indicó que, el 29 de mayo de 2023, ofreció una ubicación y localización apropiadas para implementar el PEI. Añadió que tenía instituciones disponibles, las cuales consistían en cinco escuelas del área noroeste y oeste que

---

[12] Apéndice, págs. 156-178.
[13] Apéndice, págs. 60-75.
[14] Apéndice, págs. 76-79.

proveían un salón especial en escuela regular. Entre éstas, se encontraba el plantel Ceferina Cordero Cordero de Isabela. Acotó que la alternativa de ubicación recomendada no estaba predeterminada por las preferencias particulares de un solo integrante del COMPU. Finalmente, sostuvo que la sanción solicitada no procedía y que los honorarios se aprobarían conforme la reglamentación aplicable.

Entonces, a comienzos del año académico 2023-2024, G.Z.G.G. protagonizó ciertos episodios de conducta que repercutieron en que el ente educativo privado restringiera su entrada.[15] En consecuencia y conforme el COMPU de 11 de septiembre de 2023,[16] la menor tuvo que ser ubicada provisionalmente en la escuela elemental Nueva Ceferina Cordero Cordero de Isabela, hasta completar el procedimiento administrativo incoado. Surge del expediente que la menor se ubicó en un salón especial de 11 estudiantes, con promoción de grado y programa regular (SEP Ruta 1). Asimismo, se logró identificar a una asistente de servicios, en referencia a la Sra. Mileishka Misla Méndez.

La vista administrativa se celebró el 14 de septiembre de 2023, 16 de noviembre de 2023, 8 de diciembre de 2023 y 8 de febrero de 2024. Durante los dos primeros días no desfiló prueba testifical, pero se delinearon las controversias a dirimir. Éstas son: (1) el reembolso de 2022-2023, que finalmente fue concedido; y (2) si se debía o no crear una ubicación de uno a uno, según una de las recomendaciones del *Informe de Evaluación Psicoeducativa* para el 2023-2024.[17] Se estipuló también la prueba documental que obra

---

[15] Surge del expediente que, en agosto de 2023, G.Z.G.G. golpeó a un estudiante, a la maestra, a la asistente de servicio y destruyó objetos de la escuela. TPO 8 de diciembre de 2023, págs. 140 líneas 5-25; 141 líneas 1-3; 144 líneas 11-13.
[16] Apéndice, págs. 179-183.
[17] TPO 14 de septiembre de 2023, pág. 19 líneas 21-25; 20 líneas 1-4. Además, TPO 8 de diciembre de 2023, pág. 19 líneas 16-19.

en los autos.[18] En particular, se identificaron dos documentos, a saber: (1) una carta de 12 de agosto de 2022 del señor García Santana, que no fue admitida en evidencia; y (2) un estado de cuenta, admitido como el Exhibit 1 de la parte querellante.[19] Prestaron declaración cuatro testigos. Por la parte recurrente, la señora Reyes Maldonado y la doctora Radinson Pérez; por la parte recurrida, la Dra. Jackeline Butler (doctora Butler) y el Prof. Luis Santiago (profesor Santiago).

Justipreciada la prueba documental y oral ante sí, el 23 de febrero de 2024, el DEPR emitió el dictamen administrativo recurrido.[20] Inconforme, la parte recurrente instó oportunamente el recurso de revisión judicial que nos ocupa, en el que esbozó los siguientes errores:

> **PRIMER ERROR:** Erró el Foro Administrativo recurrido al determinar que la ubicación ofrecida por el Departamento de Educación al querellante no le violó sus derechos a una educación pública, gratuita y apropiada de acuerdo con las necesidades especiales y las circunstancias de G.Z.G.G.

> **SEGUNDO ERROR:** Erró el Foro Administrativo y abusó de su discreción al descartar la prueba testifical y pericial no controvertida presentada por la parte querellante-recurrente.

> **TERCER ERROR:** Erró el Foro Administrativo al aplicar rigurosamente las reglas de Evidencia durante la vista evidenciaría; permitir constantes objeciones improcedentes dada la naturaleza administrativa del procedimiento y excluir evidencia pertinente que era parte del expediente de Educación Especial.

Sometida la Transcripción de la Prueba Oral el 10 de junio de 2024, la recurrente presentó un *Alegato suplementario de la parte*

---

[18] Exhibit I, Determinación de elegibilidad de la menor al programa de educación especial; Exhibit II, Minuta COMPU 30 de septiembre de 2020; Exhibit III, Minuta COMPU 3 de septiembre de 2021; Exhibit IV, Minuta COMPU 10 de marzo de 2022; Exhibit V, Minuta COMPU 29 de abril de 2022; Exhibit VI, Minuta COMPU 17 de junio de 2022; Exhibit VII, Minuta COMPU 22 de julio de 2022; Exhibit VIII, Minuta COMPU 22 de agosto de 2022; Exhibit IX, Minuta COMPU 29 de mayo de 2023; Exhibit X, Informe de Evaluación Psicoeducativa de 28 de marzo de 2023; Exhibit XI, Minuta COMPU 5 de julio de 2023; Exhibit XII, Minuta Compu 11 de septiembre de 2023.
[19] TPO 16 de noviembre de 2023, pág. 20 líneas 12-25. Además, TPO 8 de diciembre de 2023, pág. 6 líneas 4-7.
[20] Apéndice, págs. 18; 19-59.

*recurrente* el 8 de octubre de 2024. De otro lado, por conducto de la Oficina del Procurador General de Puerto Rico, el DEPR instó *Alegato en oposición* el 7 de noviembre de 2024. Con el beneficio de sus comparecencias, la prueba documental y testifical, podemos resolver.

**II.**

**A.**

Revisamos la *Resolución Final y Orden* en el caso del epígrafe, al palio de la Ley Núm. 38 de 30 de junio de 2017, *Ley de Procedimiento Administrativo Uniforme del Gobierno de Puerto Rico* (LPAUG), 3 LPRA sec. 9601 *et seq.* La Sección 4.5 de la LPAUG, 3 LPRA sec. 9675, que versa sobre el alcance de la revisión judicial, dispone que este tribunal intermedio sostendrá las determinaciones de hechos de las decisiones de las agencias, si se basan en evidencia sustancial que obra en el expediente administrativo; revisará en todos sus aspectos las conclusiones de derecho; y podrá conceder al recurrente el remedio apropiado si determina que a éste le asiste el derecho. Mediante la revisión judicial, esta curia debe evaluar que la decisión administrativa encuentre apoyo en la evidencia sustancial que obre en la totalidad del expediente administrativo. Por igual, examinamos que el ente gubernamental haya realizado una aplicación o interpretación correcta de las leyes o reglamentos que se le ha encomendado administrar. Finalmente, auscultamos que el organismo haya actuado dentro de los parámetros de su ley habilitadora, no de forma arbitraria, irrazonable ni haya lesionado derechos constitucionales fundamentales. Véase, *Torres Rivera v. Policía de PR*, 196 DPR 606, 628 (2016).

Por consiguiente, al momento de justipreciar la valoración y razonabilidad de las decisiones administrativas adoptadas por las agencias del poder ejecutivo, los tribunales tenemos la obligación de ejercer un juicio independiente de las disposiciones legales para

determinar si una agencia ha actuado o no dentro de los límites de su autoridad estatutaria, incluso en los casos de ambigüedad legislativa. Véase, *Loper Bright Enterprises v. Raimondo,* 144 S.Ct. 2244 (2024); 603 US __ (2024).[21] Claro está, según ha pautado el Tribunal Supremo federal, **las interpretaciones y los dictámenes administrativos —realizados por virtud del cumplimiento de un deber oficial y basados en su experiencia especializada— pueden constituir un cuerpo de experiencia y un juicio informado ("body of experience and informed judgment") al que los foros revisores y los litigantes pudiéramos recurrir en cuestiones jurídicas**. *Id.*, pág. 2259.

Ahora, el peso persuasivo de la determinación administrativa va a depender de la minuciosidad en su consideración, de la validez de su razonamiento, así como de su congruencia con pronunciamientos anteriores y posteriores. Véase, *Skidmore v. Swift & Co.*, 323 US 134, 139-140 (1944), citado con aprobación en *Loper Bright Enterprises v. Raimondo, supra*, pág. 2259.

**B.**

En nuestro ordenamiento jurídico, la educación goza de garantías de entronque constitucional. La Constitución de Puerto Rico dispone que "[t]oda persona tiene derecho a una educación que propenda al pleno desarrollo de su personalidad y al fortalecimiento del respeto de los derechos del [ser humano] y de las libertades fundamentales". Art. II, Sec. 5, Const. ELA, LPRA, Tomo 1, ed. 2023, pág. 300. Al respecto, el Tribunal Supremo de Puerto Rico ha expresado que el fin de este precepto constitucional "es definir las aspiraciones colectivas sobre la educación y crear un sistema de enseñanza pública a niveles primario y secundario exclusivamente

---

[21] En *Loper Bright Enterprises v. Raimondo, supra*, resuelto el 28 de junio de 2024, el Tribunal Supremo federal revocó la doctrina de deferencia establecida en el caso *Chevron USA, Inc. v. Natural Resources Defense Council*, 467 US 837 (1984). Con ello, además, se propende al fortalecimiento de la separación de poderes. Véase, *Loper Bright Enterprises v. Raimondo, supra*, pág. 2274 (Op. Conc. Juez Thomas).

[...] sujeto a que el Estado tenga los recursos necesarios para su implantación". *Declet Ríos v. Dpto. de Educación*, 177 DPR 765, 773 (2009); *Asoc. Academias y Col. Cristianos v. E.L.A.*, 135 DPR 150, 168-169 (1994).

Por su parte, el Congreso de los Estados Unidos aprobó la *Ley Federal de Educación Especial*, conocida como *Individuals with Disabilities Education Act*, 20 USCA sec. 1401 *et seq.* (IDEA). Este esquema legal tiene el propósito de asegurar que todos los menores con necesidades especiales reciban educación pública, gratuita y apropiada (FAPE, por sus siglas en inglés), en atención a las necesidades particulares de cada estudiante, y proteger los derechos de éstos y de sus respectivos padres o tutores. A tales fines, el estatuto dispone que los estados y territorios que reciben fondos federales tienen que promover programas de educación especial pública, gratuita y apropiada, diseñados para atender las necesidades especiales y específicas de cada menor. 20 USCA sec. 1415(a).

Cónsono con la legislación federal en esta materia y en observancia del citado precepto constitucional, la Asamblea Legislativa promulgó la Ley Núm. 51 de 7 de junio de 1996, *Ley de Servicios Educativos Integrales para Personas con Impedimentos*, según enmendada, 18 LPRA sec. 1351 *et seq.* (Ley 51). El estatuto también **propende a garantizar la educación pública, gratuita y apropiada** a los estudiantes con necesidades especiales que asistan a las escuelas públicas del País. Ello, en el **ambiente menos restrictivo posible y de conformidad con su Programa de Educación Individualizado**, ya que el PEI es el vehículo principal para la obtención de los fines legislativos. Art. 3 de la Ley 51, 18 LPRA sec. 1352. Esta herramienta es diseñada por un grupo de profesionales, conocedores de las necesidades académicas y funcionales que presenta el estudiante, el cual se denomina como

Comité de Programación y Ubicación (COMPU). El COMPU se constituye por un representante calificado del Departamento de Educación de Puerto Rico (DEPR), que conozca tanto el currículo como la disponibilidad de recursos de la región educativa; un maestro de educación regular y/o especial; el estudiante de así ser apropiado y sus encargados legales. Véase, *Manual de Procedimientos de Educación Especial*, julio 2020, Departamento de Educación, Secretaría Asociada de Educación Especial, sec. 6.1(2), págs. 56-57.

IDEA y la Ley 51 legitiman a los padres o encargados insatisfechos con los servicios educativos ofrecidos para que presenten una querella sobre cualquier asunto relacionado con la identificación, evaluación o ubicación educativa del menor, o la provisión de una educación pública, gratuita y apropiada. 20 USCA sec. 1415(b)(6). En el caso de que la persona con impedimentos no esté recibiendo una educación apropiada, en el ambiente menos restrictivo y de acuerdo con los arreglos de servicios contenidos en el PEI, el estatuto provee para que sus tutores puedan solicitar una vista administrativa ante un juzgador imparcial. *Orraca López v. ELA,* 192 DPR 31, 42 (2014); 20 USCA sec. 1415(f); Art. 4(B)(2)(d) de la Ley 51, 18 LPRA sec. 1353(B)(2)(d). El foro administrativo compelido debe determinar si al menor, en efecto, se le ha negado ese derecho; y dicha decisión es revisable ante los tribunales. *Orraca López v. ELA, supra*; 20 USCA sec. 1415(f)(g).

Al respecto, el Tribunal Supremo federal ha enunciado:

The adequacy of a given IEP [individual education plan] turns on the unique circumstances of the child for whom it was created. This absence of a bright-line rule, however, **should not be mistaken for "an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review."**[22]

At the same time, **deference is based on the**

---

[22] *Board of Educ. v. Rowley*, 458 U.S. 176, 206 (1982).

**application of expertise and the exercise of judgment by school authorities**. The Act [IDEA] vests these officials with responsibility for decisions of critical importance to the life of a disabled child. The nature of the IEP process, from the initial consultation through state administrative proceedings, ensures that parents and school representatives will fully air their respective opinions on the degree of progress a child's IEP should pursue.[23] By the time any dispute reaches court, school authorities will have had a complete opportunity to bring their expertise and judgment to bear on areas of disagreement. **A reviewing court may fairly expect those authorities to be able to offer a cogent and responsive explanation for their decisions that shows the IEP is reasonably calculated to enable the child to make progress appropriate in light of his circumstances**. (Citas omitidas y énfasis nuestro). *Endrew F. v. Douglas County School District RE-1,* 580 US 386, 404 (2017).

En lo pertinente al caso del título, la legislación federal y estatal garantizan el derecho del estudiante con discapacidad a ser educado en igualdad de condiciones que un estudiante sin discapacidad. Para ello, IDEA establece que el DEPR tendrá disponible diferentes alternativas de ubicación apropiadas donde implementar el PEI para lograr que el estudiante con discapacidad se eduque y logre progresar en el currículo general. Véase, *Manual de Procedimientos de Educación Especial, op. cit.*, sec. 8, pág. 80. El proceso de ubicación consiste en identificar las necesidades después de acomodos, servicios relacionados y suplementarios, seleccionar la alternativa de ubicación más apropiada y localizar la alternativa de ubicación. *Id.* Algunas de las alternativas de ubicación son: **un salón regular con servicios relacionados o suplementarios; o un salón especial con promoción de grado o con un currículo modificado**. *Id.*, sec. 8, págs. 81-84.

Entre los servicios suplementarios que ofrece el DEPR, se encuentra la asistencia de un maestro recurso o especialista en educación especial que sirva de apoyo para los maestros regulares, funcionarios, padres y el propio estudiante sobre cómo adaptar el

---

[23] 20 USCA secs. 1414, 1415; *Board of Educ. v. Rowley, supra*, págs. 208-209.

material educativo. El servicio del maestro recurso se ofrece bajo el modelo colaborativo consultivo, en el cual el maestro especialista en educación especial y el maestro regular trabajan juntos, se colaboran y consultan entre sí para lograr que el estudiante progrese en el currículo regular o adaptado. En este modelo, la intervención con el estudiante puede ser en y fuera del salón de clases (*push-in* o *pull-out*), en intervenciones uno a uno o en grupos pequeños. **El maestro recurso determinará si el estudiante requiere o no que se utilicen ambas intervenciones**. *Manual de Procedimientos de Educación Especial, op. cit.*, sec. 12.3(A), págs. 145-149.

Conforme la fuente citada, para que un estudiante sea elegible a la intervención de un maestro recurso, éste debe haber recibido acomodos razonables y servicios dentro del salón de clases pero, aun así, su progreso académico se vio afectado; o ser reintegrado en la corriente regular luego de recibir servicios educativos en un salón especial a tiempo completo; o **el COMPU determinar que el estudiante requiere de intervenciones educativas individualizadas**; o que el maestro regular sea capacitado sobre cómo trabajar con un estudiante con la discapacidad por la cual fue elegible en el programa. *Id.* sec. 12.3(B); pág. 150.

**III.**

**A.**

En el caso de epígrafe, la parte recurrente impugna la localización y ubicación ofrecida por el DEPR a G.Z.G.G, la cual, contrario a lo recomendado por la doctora Radinson Pérez, no contempla el ofrecimiento uno a uno. Examinemos los testimonios:

***Olga del Mar Reyes Maldonado***

La madrastra y cuidadora de G.Z.G.G. habló de su diagnóstico de autismo moderado (nivel II). Desde la determinación de elegibilidad en 2019 se pautó que la menor presentaba problemas interpersonales, comunicación social, manejo de emociones y

dificultades en aspectos funcionales del diario vivir. Sin embargo, su conducta no se presenta en todos los lugares.[24]

Sobre la ubicación, declaró:

Sí, sí, en, en un inicio en el... en lo que fue segundo grado 2022-23 que fue que comenzamos con la asistente que nosotros estábamos sufragando ahí sí vimos cambios positivos. Pero verdad, había un rezago de muchos años de, verdad, unos procesos que ella no tuvo estructura ni una socialización adecuada en la escuela porque no tuvo la oportunidad. Así que eso llegó hasta cierto punto.

Se hicieron los acomodos, verdad, necesarios en ese momento, pero sabemos que esto es algo cambiante. No es algo lineal. Y lo que se observó fue que a la falta de estructura de ella se llegó hasta cierto punto los logros. Pero después para poder continuar para que ella ejecutara, verdad, de una manera adaptativa, pues hacían falta otros, verdad, otros... un, un servicio más dirigido y enfocado a ella.

Y se entendió que al ella tener, verdad, los, los incidentes que tuvo con otros estudiantes y con las maestras y con las cosas que habían [*sic*] en el salón, pues, verdad, se hizo la recomendación de que ella estuviera periódicamente, verdad, por un tiempo en "one to one". En una ubicación "one to one" que ella pudiese estar tanto con una maestra de Educación Especial con ella y con la asistente. Ambas, verdad, por un tiempo y entonces dedicar un tiempo para que ella pudiese socializar y continuar en su proceso de adaptación a estar con otros niños. Esa fue la recomendación.[25]

En esencia, la testigo se basa en las recomendaciones producto de la evaluación psicoeducativa realizada por la doctora Radinson Pérez.[26] Como mencionamos, estas recomendaciones fueron planteadas en el COMPU de G.Z.G.G. y acogidas de manera parcial, ya que no se aceptó el uno a uno por ser una opción muy restrictiva. En consecuencia, se instruyó a los padres a visitar las escuelas con los ofrecimientos del DEPR, lo cual realizaron.[27] La testigo reconoció que, en la escuela Ceferina Cordero Cordero, si

---

[24] TPO 8 de diciembre de 2023, págs. 10; 11 líneas 1-2; 12 líneas 10-14.; 13 líneas 3-4.
[25] TPO 8 de diciembre de 2023, págs. 99 líneas 24-25; 100.
[26] TPO 8 de diciembre de 2023, págs. 102 líneas 16-25; 103 líneas 1-2.
[27] TPO 8 de diciembre de 2023, págs. 114 líneas 16-25; 115 líneas 1-4; 118 líneas 7-12; 126 líneas 13-24; 127.

bien no se ofrece el uno a uno, la niña sí cuenta con una asistente y recibe terapia del habla y terapia psicológica.[28]

La señora Reyes Maldonado atestiguó que deseaba que G.Z.G.G. continúe en el sistema de educación pública y que se cree la ubicación recomendada de uno a uno en un 75% y el 25% restante de manera integrada en la corriente regular.[29] En el caso de CADEI, la testigo aseguró que, debido a unos incidentes de conducta agresiva de G.Z.G.G., la institución privada ofreció servicios educativos de manera virtual o presencial en modalidad uno a uno en el año académico 2023-2024. No obstante, el uno a uno no podía sufragarse económicamente y la modalidad virtual no era una opción viable para la menor.[30] Actualmente, afirmó que el maestro de G.Z.G.G. le ha indicado que la menor ha tenido crisis emocionales, ha interrumpido la clase y ha tenido altercados con otros estudiantes.[31]

### Dra. Eva Yanet Radinson Pérez

La testigo ostenta un Bachillerato en Ciencias de Enfermería, una Maestría en Consejería Psicológica y un Doctorado en Psicología Clínica.[32] Durante 18 años trabajó en la Administración de Servicios de Salud Mental y Contra la Adicción en la sala de emergencia psiquiátrica de niños y adolescentes; y en los últimos 13 años ha laborado en su oficina privada.[33]

Evaluó a G.Z.G.G. en tres sesiones de dos horas cada una.[34] Declaró que la menor tiene capacidad para realizar trabajos, pero "hay que estar dirigiéndola, enfocándola, motivándola, tal vez ayudándola a bajar, verdad, esos estados, a conectarse con

---

[28] TPO 8 de diciembre de 2023, págs. 130 líneas 7-25; 131 líneas 1-3.
[29] TPO 8 de diciembre de 2023, pág. 131líneas 4-13. Originalmente, se solicitó la compra de servicios en CADEI para el año 2023-2024. Véase, TPO 8 de diciembre de 2023, pág. 139 líneas 8-12.
[30] TPO 8 de diciembre de 2023, págs. 155 líneas 22-25; 156 líneas 1-8. Para los costos mensuales, refiérase a la TPO 8 de diciembre de 2023, pág. 167.
[31] TPO 8 de diciembre de 2023, pág. 183 líneas 13-24.
[32] TPO 8 de diciembre de 2023, pág. 201 líneas 3-9.
[33] TPO 8 de diciembre de 2023, pág. 202 líneas 13-21.
[34] TPO 8 de diciembre de 2023, pág. 209 líneas 7-11.

emociones. O sea, a lidiar con esas emociones, con ese manejo".[35] Describió a la niña como amigable, simpática y comunicativa. En ocasiones, activa, insegura, no persistente en sus tareas.[36] Indicó que la menor tenía una capacidad cognitiva promedio, promedio bajo o muy bajo, "pero generalmente ella tiene la capacidad para hacer los trabajos que se le... que se le piden".[37] A tales efectos, recomendó una evaluación con un neurólogo pediátrico, debido a unos indicadores de un posible problema de neurodesarrollo; una evaluación psiquiátrica, para el manejo de conducta agresiva, sin descartar la medicación; y una evaluación psicológica, para el manejo de frustraciones y rabietas.[38]

En lo pertinente al uno a uno, la perita de la parte recurrente declaró:

> También le... también le recomendé lo que era el servicio "one to one" de una... en un inicio de un setenta y cinco y un veinticinco en un salón modificado y que este servicio se fuera gradualmente evaluando al punto de que ella pudiera ya estar en una corriente sin, sin necesidad de un "one to one".[39]

El uno a uno es para ofrecer estructura a la menor a nivel conductual y a nivel académico.[40] "[P]ara ayudarla a manejarse en lo que entonces la podemos llevar *full*" en aquellas tareas que se le dificultan más.[41] Es decir, en un salón uno a uno, la perita Radinson Pérez explicó que la niña estaría sola con su maestro y su asistente. Indicó que el espacio pequeño debía tener pocos estímulos.[42]

Atestiguó que la ausencia de un sistema uno a uno en un 75% o la falta de estructura incidiría a nivel emocional, causando más ansiedad y frustración. Los sonidos y distracciones repercutirían en

---

[35] TPO 8 de diciembre de 2023, pág. 211 líneas 12-16.
[36] TPO 8 de diciembre de 2023, págs. 212 líneas 20-21; 213 líneas 1-3, 11.
[37] TPO 8 de diciembre de 2023, pág. 213 líneas 13-17.
[38] TPO 8 de diciembre de 2023, págs. 214 líneas 1-17; 218 líneas 22-25; 244 líneas 19-23.
[39] TPO 8 de diciembre de 2023, pág. 214 líneas 20-25.
[40] TPO 8 de diciembre de 2023, pág. 269 líneas 1-6.
[41] TPO 8 de diciembre de 2023, págs. 217 líneas 23-25; 218 líneas 3-6.
[42] TPO 8 de diciembre de 2023, pág. 237 líneas 7-23.

la falta de enfoque; y, por ende, afectarían el área académica porque la niña no puede dirigirse por sí sola.[43] El 25% en un salón modificado, de no más de diez estudiantes, lo justificó ante la capacidad cognitiva demostrada por la menor. Aseveró que el salón le va a permitir a G.Z.G.G. ver qué es lo que hay en un salón regular; y a los profesionales, educadores y terapistas, les va a dar la oportunidad de conocer cómo ella reacciona a los estímulos.[44]

> Okey. La diferencia es en espacio. Verdad, acá en el "one to one" sería un espacio solito para, para ella. En el otro, pues ya sería un espacio compartido. En ese espacio compartido por eso es que le incluyo no más de diez niños para poder tener un poquito más de control en cuanto a sonido, en cuanto estímulo, a cuanto a ubicarla. Siempre se recomienda que sea en un lugar bastante cerca, verdad, del, del maestro para que entonces me le puedan dar seguimiento a, a las instrucciones, a si las entendió, a si está haciendo el trabajo, motivarla. El dirigirla a ver si hay algún tipo de frustración. Todas esas cositas.
> Pero básicamente, que esté en un lugar libre de, de distractores, ¿no?, lo mismo. En un grupo pequeñito para que no tenga tantas situaciones con, con los ruidos. Básicamente, eso.[45]

Resaltó que la niña debía tener un maestro de educación especial, con experiencia en autismo.[46] Por igual, recomendó la inclusión de material visual manipulativo, trabajar de forma independiente, ofrecer tiempo adicional para las tareas y brindar asistencia tecnológica.[47]

Con respecto a la modificación de conducta, recomendó psicoterapias para el manejo de emociones.[48] Afirmó que era contraproducente meramente sacar a la niña del salón ante una crisis.[49] Aun cuando la doctora Radinson Pérez reconoció que G.Z.G.G. necesitaba el área social con otros compañeros,[50] expresó

---

[43] TPO 8 de diciembre de 2023, págs. 219 líneas 8-25; 220 líneas 16-25; 221 líneas 3-8.
[44] TPO 8 de diciembre de 2023, págs. 221 líneas 9-22; 228 líneas 13-14.
[45] TPO 8 de diciembre de 2023, pág. 240 líneas 2-16.
[46] TPO 8 de diciembre de 2023, págs. 229 líneas 21-25; 230 línea 1.
[47] TPO 8 de diciembre de 2023, págs. 233 líneas 20-25; 234 líneas 7-18.
[48] TPO 8 de diciembre de 2023, pág. 223 líneas 1-8.
[49] TPO 8 de diciembre de 2023, págs. 231-233.
[50] TPO 8 de diciembre de 2023, pág. 222 líneas 5-9.

que inicialmente hacía unas recomendaciones más restrictivas y, en la medida que la persona fuera mejorando, las recomendaciones eran más abiertas.[51]

La perita Radinson Pérez enfatizó, a su vez, en la necesidad de una asistente de servicio para G.Z.G.G., en lo académico, "para poder enfocarse, para poder dirigirse. [...] Ella tiene la capacidad para ejecutar, pero necesita ayuda para poder ejecutar".[52] La asistente de servicio, además, apoyaría en los aspectos de alimentación e higiene.[53] En lo emocional, apostilló que también era muy importante que la niña tuviera un asistente de servicio.[54]

> Que ella se adapte a todo esto y paulatinamente porque tiene la capacidad. Lo vimos allí con las ayudas, con las evaluaciones que, que ella requiere y todo esto paulatinamente yo sé que ella me va a poder correr. Y a nivel emocional se va a poder manejar. Que es lo más que a mí me, verdad, me preocupa de todo esto.
>
> En la medida que ella tenga eso, ella se adapte a su asistente, ella entonces pueda, pueda recibir esa asistencia en esas tareas que se le hacen bien difícil. Que los mismos... Por eso le añadí al final que a medida que el personal realizara evaluaciones y emitiera informes de progreso el "one to one", pues puede ir siendo reducido. Facilitando entonces mayor espacio dentro del salón de... modificado en corriente regular.[55]
>
> .    .    .    .    .    .    .    .    .
>
> Ésta es la persona clave [en referencia al asistente de servicio] para poder, primero, ayudarla a identificar emociones, a manejar, a recordarle cómo ella puede manejar esas emociones, ayudarle a trabajar con esas frustraciones de una forma rápida, aparte de todas las otras, verdad, formas en la que las puede ayudar. Yo creo que ésa es la pieza clave para poderla... para poderla ayudar en ese sentido de las... de las conductas.[56]

De otro lado, el DEPR concuerda con la decisión administrativa recurrida, acerca de que la ubicación actual de la menor es la apropiada para dar cumplimiento al PEI. Evaluemos la prueba testifical vertida a esos efectos.

---

[51] TPO 8 de diciembre de 2023, pág. 225 líneas 20-25.
[52] TPO 8 de diciembre de 2023, págs. 215 líneas 24-25; 216 líneas 1-2.
[53] TPO 8 de diciembre de 2023, pág. 216 líneas 20-23.
[54] TPO 8 de diciembre de 2023, pág. 226 líneas 8-14.
[55] TPO 8 de diciembre de 2023, pág. 218 líneas 7-20.
[56] TPO 8 de diciembre de 2023, pág. 226 líneas 14-21.

***Dra. Jackeline Butler***

La testigo funge como facilitadora docente de educación especial. Ostenta un Bachillerato y Maestría en Educación Especial, así como un Doctorado en Tecnología Educativa y Educación a Distancia. Tiene 20 años de experiencia en el DEPR.[57] Conoce el caso de G.Z.G.G. desde mayo de 2023.[58]

La doctora Butler reconoció que ninguna de las cinco escuelas recomendadas a la recurrente ofrece la modalidad educativa de uno a uno.[59] Asimismo, la testigo sabía acerca de la recomendación de la doctora Radinson Pérez sobre el uno a uno (75%/25%). Al respecto, explicó lo siguiente:

> La postura del Departamento de Educación en ese momento [mayo de 2023] era que, pues que esa es una de las alternativas más restrictivas, verdad, el "one to one". Aunque ella se lo recomendaba sólo para el servicio educativo. Y luego, le recomendaban un salón estructurado. El "one to one" era una, verdad, una alternativa más restrictiva. La estudiante había estado en un salón regular. Había participado en ese salón regular. Tenía buenas calificaciones, tenía A. Tenía progreso en los servicios relacionados. Y a raíz de eso nosotros, verdad, no avalamos el "one to one" y sí le recomendamos un salón Ruta 1, verdad, en donde son de diez a, a doce estudiantes. El maestro es de Educación Especial y es un grupo más pequeño, verdad, y asistente.[60]

Es decir, para la declarante, la Ruta 1 es menos restrictiva, ya que se realiza en un salón pequeño, con 10 a 12 estudiantes, un maestro de educación especial, currículo regular, sistema de notas y con asistente de servicios. Precisamente por lo restrictivo que resulta el uno a uno es que se rechazó la recomendación. Apuntó que la menor tenía problemas de conducta, más no cognitivos. Para su corrección, la niña requiere interactuar con otros estudiantes.[61] Añadió que, en una ocasión, visitó el aula y constató que G.Z.G.G.

---

[57] TPO 8 de febrero de 2024, págs. 9 línea 25; 10 líneas 1-12.
[58] TPO 8 de febrero de 2024, pág. 10 líneas 13-21.
[59] TPO 8 de febrero de 2024, pág. 86 líneas 3-14.
[60] TPO 8 de febrero de 2024, págs. 18 líneas 11-25; 19 líneas 1-7.
[61] TPO 8 de febrero de 2024, págs. 20 líneas 2-15; 25 líneas 11-25; 26 líneas 1-14.

contestó de forma oral un examen de inglés. El salón tenía 11 estudiantes. Mencionó que el IQ de la menor según el *Informe de Evaluación Psicoeducativo* es compatible con la Ruta 1.[62]

> En cuanto a, a... al informe, verdad, académico nos decía, verdad, que ella presentaba problemas de conducta, que se frustraba fácilmente. Que manifestaba episodios frecuentes de gritar, de llorar, agredía compañeros, adultos, rompía papeles, voltea sillas, conducta retante ante figuras de autoridad. Verdad, eso era en cuestión de la conducta. Pero cognitivamente no decía que dominaba la lectura, que tenía comprensión lectora, que identificaba palabras, fonemas.
>
> Tenía problemitas para escribir. Nos los decía. Y en ocasiones, pues invertía letras. Pero decía que ella dominaba la suma, la resta, multiplicaciones de, de hasta la tabla del nueve. Identificaba las figuras geométricas, tridimensionales, planas. O sea, sí tenía problemas para resolver problemas verbales, verdad, pero la niña cognitivamente podía participar, o sea, en un grupo. Y ella estaba en un grupo regular [en el Colegio CADEI]. Estaba, verdad, participando en un grupo grande. Y aún así ella obtuvo sus notas, su progreso académico. Tenía A.[63]

En el caso de G.Z.G.G., la doctora Butler aseguró que, en grupos pequeños, con asistente y otros profesionales como un trabajador social, un consejero y un psicólogo, se pueden trabajar los planes de modificación de conducta que la menor requiere.[64]

Durante el turno de contrainterrogatorio, la representación legal de la parte recurrente intentó infructuosamente presentar una prueba de refutación que no fue admitida con ese fin, pero quedó como ofrecida y no admitida. Consistió en el informe de notas de G.Z.G.G. para el 9 de enero de 2024.[65] Esta información, que obviamente no existía a la fecha de mayo de 2023, refleja que G.Z.G.G. bajó las notas.

En torno a ese hecho, la doctora Butler se sostuvo en su recomendación de la Ruta 1 para G.Z.G.G. Ello así, ya que explicó que la menor se estaba adaptando a una nueva escuela y a los

---

[62] TPO 8 de febrero de 2024, págs. 27 líneas 1-8; 28 líneas 9-10; 40 líneas 9-23.
[63] TPO 8 de febrero de 2024, págs. 40 líneas 24-25; 41 líneas 1-17.
[64] TPO 8 de febrero de 2024, págs. 41 líneas 24-25; 42 líneas 1-14.
[65] TPO 8 de febrero de 2024, págs. 57-65. Refiérase al Apéndice, págs. 84-85.

compañeros. Por su condición de autismo, ésta requiere tiempo para adaptarse y demostrar su potencial cognitivo.[66]

> Unjú. Porque cuando la niña viene a la escuela sigue con los problemas de conducta. No se había adaptado ni a la escuela ni al salón ni a los compañeros. Ella no quería hacer trabajos, tenía rabietas, rompía la tarea. No quería realizar ninguna tarea, ¿verdad? No es hasta que entonces entra la asistente, cuando ella tiene la asistente, verdad, es que ella empieza entonces a ir modificando conducta y empezando a hacer trabajos.
>
> Hay que darle la oportunidad a la estudiante, verdad, porque ella tiene, verdad, una condición de autismo en donde ella no se va a adaptar de, de primera mano a llegar al salón y a la escuela y todo está bien. En lo que la estudiante se adapta, verdad, y va haciendo los trabajos. En ese periodo de tiempo del primer semestre, pues ella casi no realizó ninguna tarea.
>
> Hubo tiempos libres en la escuela por, por diferentes situaciones, verdad, y la nena no ha podido demostrar, verdad, su, su, verdad, su, su, su potencial cognitivo que ella tiene. Okey. Y ahora es que la estudiante se sienta en el salón, hace tareas.[67]

### Prof. Luis Santiago

El declarante es el maestro de educación especial de G.Z.G.G. El docente cuenta con 14 años de experiencia y está certificado en autismo.[68] Describió a la recurrente como "una niña muy brillante" que se encontraba en etapa de adaptación en el grupo, ya que llegó a mediados de septiembre, "pero que está funcionando por el momento muy bien".[69] No fue hasta noviembre que contó con una asistente de servicio, por lo que en las primeras diez semanas no recibió calificaciones.[70] Atestiguó que la niña ha ido mejorando poco a poco. Al principio no toleraba el salón, gritaba, agredía a otros compañeros, se escapaba y no quería hacer las tareas.[71] Sin embargo, el profesor Santiago declaró que la menor "ha cambiado de tal manera que todas las tareas que se le han dado en el salón de clase las está realizando. Las hace muy bien. Ella está participando.

---

[66] TPO 8 de febrero de 2024, págs. 68 líneas 9-25; 69 línea 1; 70 líneas 24-25; 71 líneas 1-20.
[67] TPO 8 de febrero de 2024, págs. 70 línea 25; 71 líneas 1-19.
[68] TPO 8 de febrero de 2024, págs. 91 líneas 20-25; 92 líneas 1-8.
[69] TPO 8 de febrero de 2024, pág. 92 líneas 9-22.
[70] TPO 8 de febrero de 2024, pág. 93 líneas 1-13.
[71] TPO 8 de febrero de 2024, págs. 93 líneas 21-25; 94 líneas 1-10.

Comparte más con los compañeros...".[72] Explicó que está utilizando más el pupitre, se disculpa con sus compañeros si ocurre algún incidente, participa en clase y está trabajando bien en las terapias.[73] "[T]odavía tiene sus momentos porque estamos en un proceso. [...] Pero en estos momentos yo diría que es un cambio bien grande el que ha tenido para el poco tiempo".[74] De hecho, el día anterior, G.Z.G.G. realizó con éxito unas pruebas de lectura. "Ella es excelente. Ella las contestó".[75] El profesor Santiago admitió que la niña ha tenido unos pocos incidentes, pero se calma y busca ayuda.[76]

> De verdad, que ella va a seguir mejorando. Cada día va a ser mucho mejor. Y la socialización que es algo muy importante. Que para mí no es solamente la parte académica. No, esto no es solamente tener cada nota y tener... sacar A. Aquí, aquí no se trata de eso. Es que ella tenga un proceso completo como toda niña. Que tenga la oportunidad de socializar con otros. Ella lo está realizando.
>
> A veces dice, "No quiero tener amigos", pero de momento dice que sí. Antier estaba peleando porque decía, "Él es mi amigo, él es mi amigo" le decía a otro compañerito y porque otra decía, "No, él es mi amigo" y ella, "No, es mi amigo". Ella sigue el juego con ellos. Por eso, ahí es donde demostramos la importancia de esa socialización que ha creado. Y se sienta al lado de otro tranquilamente ya.
>
> Comparte en momentos de comida, de merienda. Ha compartido con ellos y se sienta. El tiempo o "free time" que se le da también después de almuerzo que se le da un poco de tiempo de "free time" se ha sentado con ellos muy bien. Ha podido compartir y llevar esa relación de compañeros, de amigos lo está haciendo.[77]

Acerca de las calificaciones, el testigo explicó que la niña tuvo unos incompletos por aquellas tareas que, en su día, se negó a culminar. Actualmente, junto a la asistente de servicio, ha trabajado todas las tareas y es de las primeras que termina.[78] El testigo aseveró que, para la próxima evaluación, G.Z.G.G. demostrará su

---

[72] TPO 8 de febrero de 2024, págs. 94 línea 25; 95 líneas 1-3.
[73] TPO 8 de febrero de 2024, pág. 95 líneas 4-24.
[74] TPO 8 de febrero de 2024, pág. 96 líneas 1-5.
[75] TPO 8 de febrero de 2024, pág. 96 líneas 15-20.
[76] TPO 8 de febrero de 2024, pág. 97.
[77] TPO 8 de febrero de 2024, pág. 98 líneas 1-21.
[78] TPO 8 de febrero de 2024, pág. 99 líneas 4-25.

potencial. "En serio, ella va, va subiendo la cuesta. De verdad, está ejerciendo muy bien su trabajo".[79]

Dijo que la niña lee y escribe con ayuda, y los exámenes son orales.[80] Desde la evaluación de las veinte semanas ha empezado a hacer un mejor trabajo académico.[81]

> Hasta ahora, en el ritmo que ella lleva ahora es para sacar A en las próximas. Porque las que ella sacó de las veinte semanas no fue porque las tenía incorrectas en la parte que ella hacía. Es que los dejaba incompletos. No los realizaba. No quería realizarlos. Rompía la tarea, la botaba, le podía dar otra, volvía y la rompía y la botaba porque decía que no la iba a hacer.
> Pero no es por el hecho de que no pueda realizarlo, sino que era que no lo deseaba. Y eso es parte de lo que se trabaja en la conducta.[82]

El testigo constató unos incidentes de conducta, por ejemplo, la niña se escapó de las terapias, mordió a la asistente y la agredió en la mano con un lápiz. Además, la menor se introdujo dos perlas en la boca.[83] Pero, del mismo modo, el profesor Santiago reconoció que la asistente de servicio ha sido una diferencia en la ejecución educativa y conductual de la menor.[84]

**B.**

En la causa presente, en los primeros dos señalamientos de error, los cuales por su relación intrínseca discutiremos en conjunto, la parte recurrente plantea que el DEPR violó los derechos de G.Z.G.G. al determinar que la ubicación ofrecida por el recurrido es la apropiada, así como al descartar la prueba pericial no controvertida de la doctora Radinson Pérez. No nos persuade.

De entrada, es preciso aclarar que las recomendaciones de la doctora Radinson Pérez no son mandatorias para el COMPU o el DEPR. Recuérdese que IDEA y la Ley 51, *supra*, promueven el

---

[79] TPO 8 de febrero de 2024, págs. 100 líneas 7-25; 101 líneas 1-2.
[80] TPO 8 de febrero de 2024, págs. 104 líneas 5-24; 116 líneas 18-25; 117 líneas 1-4; 122 líneas 8-10.
[81] TPO 8 de febrero de 2024, págs. 113 líneas 18-25; 114 líneas 1-3.
[82] TPO 8 de febrero de 2024, pág. 126 líneas 14-23.
[83] TPO 8 de febrero de 2024, págs. 105 líneas 4-22; 106 líneas 12-15; 108-109.
[84] TPO 8 de febrero de 2024, págs. 125 líneas 2-25; 126 líneas 1-9; 137 líneas 21-25; 138.

ofrecimiento de una educación pública, gratuita y apropiada, dentro del ambiente menos restrictivo posible. Por ello, en este caso, luego de un examen sosegado del expediente y los testimonios desfilados, estimamos que la creación del servicio académico uno a uno, incluso de manera temporal, no se justifica en el caso de G.Z.G.G. La modalidad uno a uno es de una naturaleza muy restrictiva para el nivel cognitivo de la recurrente —por lo que resulta contraria a los postulados de la legislación pertinente— y no cumple con los criterios del *Manual de Procedimientos de Educación Especial*. Si bien G.Z.G.G. no ha estado libre de incidentes conductuales, lo cierto es que los expertos en educación especial y autismo que declararon en el proceso han coincidido en que la menor se encuentra en una etapa de adaptación y que ha demostrado progreso académico, sin restricciones de su socialización.

Igualmente opinamos que la parte recurrente no nos ha colocado en posición de intervenir con el criterio pericial de la parte recurrida. Ciertamente, la recomendación avalada por el DEPR ha sido sostenida por las declaraciones de la doctora Butler y del profesor Santiago. A diferencia de la perita de la parte recurrente que evaluó a la menor en un par de fechas a comienzos de 2023, el docente Santiago, formado en educación especial y autismo, ha impartido clases durante meses a la menor y constató el cambio significativo que ha observado G.Z.G.G. durante su proceso de adaptación. Por ejemplo, la niña culmina las tareas, participa en clase, sigue instrucciones, ha mostrado progreso académico y socializa con otros compañeros.

En cuanto a lo conductual, debemos coincidir en que la menor necesita interactuar también con sus pares para mejorar sus problemas de conducta, en lugar de permanecer sola con dos adultos la mayor parte del día. Se ha observado que, junto a otros

compañeros, G.Z.G.G. ha evolucionado, se disculpa si se desata algún incidente e, incluso, ha verbalizado que tiene amigos.

Nótese, además, que la recomendación uno a uno para atender los problemas de conducta de la menor es una más entre un conglomerado de sugerencias de necesidades. Entre éstas, una de las más importantes y que ha incidido de manera significativa en el progreso de la recurrente es el ofrecimiento de un asistente de servicio. Aunque tardíamente, este remedio ya ha sido satisfecho en el sistema público. De hecho, la diferencia con CADEI no radicó en un sistema uno a uno, ni siquiera grupos pequeños, sino en que contaba con el apoyo de un asistente de servicio. Como dijo la doctora Radinson Pérez, la asistente de servicio "sería la primera línea para poder entonces ayudarla a manejar una crisis o a evitar una crisis de antemano".[85]

De conformidad con el expediente ante nos, la ubicación de la menor ha contemplado la menor restricción posible. Está ubicada en un salón de educación especial, de 11 estudiantes, con promoción de grado, programa regular (SEP Ruta 1) y cuenta con lo esencial en su caso: una asistente de servicio. Del testimonio vertido por el profesor Santiago, acogido en las aseveraciones fácticas del foro recurrido, G.Z.G.G. "había demostrado aprovechamiento" en esa ubicación.[86] Por consiguiente, somos del criterio que ordenar sin más el uno a uno (75%/25%) de manera temporera, para atender unos problemas puntuales de conducta, no de índole cognitiva, no necesariamente beneficiaría los mejores intereses de la recurrente. Incluso, podría perjudicar el progreso mostrado en la ubicación actual.

Obsérvese también que la perita Radinson Pérez recomendó la continuación de la terapia ocupacional, una evaluación

---

[85] TPO 8 de diciembre de 2023, pág. 239 líneas 11-13.
[86] Apéndice, pág. 37 acápites 63 y 69.

neurológica pediátrica para descartar un trastorno del neurodesarrollo, evaluación psiquiátrica para el manejo de la agresividad, así como una evaluación psicológica para explorar sus emociones y el manejo de éstas.[87] Decididamente estas recomendaciones sí están mejor encaminadas a la atención de las crisis conductuales que ha experimentado la menor. Los encargados de G.Z.G.G. están compelidos a dar continuidad a estas recomendaciones de su experta.

El Tribunal Supremo federal ha sido claro que la revisión judicial no debe confundirse con una invitación a los tribunales a sustituir la política educativa de las autoridades escolares. Véase, *Board of Educ. v. Rowley*, supra. En este caso, además, concluimos que, a través de su experiencia, el DEPR brindó una explicación convincente y receptiva de su decisión al refrendar la ubicación y localización menos restrictiva, ofrecida por el COMPU para dar cumplimiento al PEI de la menor, de manera que se concretice el progreso apropiado a la luz de las circunstancias de G.Z.G.G.

Finalmente, en el tercer señalamiento de error, la parte recurrente disputa una alegada aplicación rigurosa del derecho probatorio, por parte de la jueza administrativa, Lcda. Wilmarie Santoni Cruz. No tiene razón.

El *Reglamento del procedimiento para la resolución de querellas administrativas de educación especial y sobre la otorgación de honorarios de abogados*, Reglamento Núm. 9168 de 26 de febrero de 2020, dispone que "[l]as Reglas de Evidencia no serán de aplicación a las vistas administrativas, pero los principios fundamentales de evidencia se podrán utilizar para lograr una solución rápida, justa y económica del procedimiento". Véase, Reglamento Núm. 9168, Art. 9, *Vista administrativa*, inciso (7)(a)(vii).

---

[87] Apéndice, págs. 147-148.

Cónsono con lo anterior, de los autos se desprende que la jueza administrativa aclaró que las Reglas de Evidencia se aplicarían de forma flexible; así como que las objeciones debían proceder en derecho. A esos fines, la representación legal de la parte recurrente solicitó instrucción a los testigos.[88]

Ahora bien, la flexibilidad de la aplicación de los principios del derecho probatorio en este tipo de procedimiento no equivale a la admisión sin más de prueba sin previa autenticación o prueba de referencia. Tampoco es permisible que, en el desfile de prueba oral, la representación legal de una parte declare por los testigos, mediante interrogantes persuasivas en los turnos del directo o del redirecto, o realice preguntas compuestas en los contrainterrogatorios. Es necesario salvaguardar la pureza de los procedimientos en la búsqueda de la verdad.

En el caso particular de la misiva de 12 de agosto de 2022,[89] se acordó que su autor, el señor García Santana, la autenticaría, pero éste nunca testificó en la vista, por lo cual lógicamente el documento no fue admitido.[90] Tampoco se tomó conocimiento oficial del contenido del documento.[91] Huelga comentar de todas formas, que la referida misiva no afectó la decisión del foro impugnado de conceder el reembolso solicitado por la parte recurrente.

Contrario a lo alegado, tal como hemos resumido, sí desfiló prueba oral sobre incidentes recientes de la conducta de la menor. Sin descartar estos sucesos puntuales de conducta, el profesor Santiago enfatizó que el progreso académico de G.Z.G.G., la culminación de tareas y la socialización han sido parte de un

---

[88] TPO 8 de diciembre de 2023, págs. 7 líneas 6-18; 8-9.
[89] Refiérase al Apéndice del *Alegato suplementario de la parte recurrente,* pág. 43.
[90] TPO 8 de diciembre de 2023, págs. 78 líneas 20-25; 79-80; 81 líneas 1-2; 276 líneas 7-18.
[91] TPO 8 de diciembre de 2023, págs. 133 líneas 14-24; 134 líneas 1-20. En cuanto al estado de cuenta, éste sí fue recibido en evidencia como el exhibit 1 de la parte querellante.

proceso gradual y que el potencial de la menor podrá observarse en futuras calificaciones.[92]

Del mismo modo, aunque el informe de notas de enero de 2024 no fue admitido en evidencia por ser posterior a los hechos en controversia —la impugnación de la postura del DEPR adoptada en mayo de 2023— el tribunal administrativo aplicó amplia flexibilidad durante la vista en su fondo. Ello así, porque se permitieron preguntas en torno al documento y su contenido, así como de la ejecución en general de la menor durante el primer semestre e inicios del segundo del año académico 2023-2024.

En fin, luego de evaluar las resoluciones por parte de la funcionaria administrativa de aquellas discrepancias planteadas en torno a las objeciones y la admisión de evidencia, no observamos una aplicación indebida de los principios fundamentales evidenciarios al procedimiento administrativo. Colegimos, pues, que el error no fue cometido.

**IV.**

Por lo fundamentos expresados, confirmamos la *Resolución Final y Orden* recurrida.

Lo acordó y manda el Tribunal, y lo certifica la secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones

---

[92] A la fecha en que este caso se perfeccionó, 7 de noviembre de 2024, ya había culminado el año académico 2023-2024.